SARTAIN, Judge.
The plaintiffs are individual taxpayers of the State of Louisiana and certain trade unions. The defendants are officials of the State of Louisiana, sued in their official capacities, and the health and hospitalization and life insurers of the employees of the state. Plaintiffs seek to enjoin the defendants from effecting a .171,4:% premium increase commencing December 1, 1971. On a rule nisi issued at plaintiffs’ instance, the trial judge for oral reasons assigned, issued a preliminary injunction as prayed for. It was stipulated between counsel for all parties that the evidence and testimony adduced at the hearing on the rule be submitted to the court for a decision on the merits. Whereupon, the trial judge made his preliminary injunction permanent, from which judgment defendants now appeal. We reverse.
The facts giving rise to the instant litigation are not in dispute. As will be hereinafter shown for many years most of the agencies of our state government had obtained group health and hospitalization and life insurance coverage for the benefit of the employees within each agency. On March 3, 1969, the Honorable John J. McKeithen, Governor of the State of Louisiana, issued Executive Order Number 70 directing Mr. W. W. McDougall as Commissioner of the Division of Administration to establish a master group life and health insurance program for all state employees. Accordingly, on July 1, 1970, Mr. McDougall executed a group hospitalization and medical services insurance policy with Louisiana Hospital Service, Inc., and Hospital Service Association of New Orleans (Blue Cross) and a group life insurance policy with Pan American Life Insurance Company.
The aforementioned policies contained provisions guaranteeing the premium rate for the first sixteen months with the provision that thereafter the premium rates could be annually modified to effect an increase or decrease in the event experience under the policies so dictated. Prior to October 12, 1971, Mr. McDougall commenced negotiating with the insurers and on behalf of the state consented to the increase. Under date of October 12, 1971, by memorandum addressed to “Heads of all State Agencies, Boards and Commissions” the premium increase was announced to become effective as of December 1, 1971, with further instructions to the heads of the agencies, etc., to take steps by November *347 1, 1971, to implement the premium increase. This suit was filed on October 27, 1971.
Plaintiffs allege that premium increases resulting from “renegotiations” is violative of R.S. 39:174, et seq., which provides that contracts of insurance entered into by the State of Louisiana shall be obtained by competitive bidding, etc., as evidenced by the following quoted pertinent provision:
“§ 174. Advertisement for bids; right reserved to purchase from state institutions
Contracts shall be let for the furnishing of supplies, materials, insurance, contractual services and equipment by advertising therefor in the manner provided by law. Contracts may not be let for periods greater than two years and shall be let to begin with the ensuing fiscal year of the state. No contract may be let for more than one year unless it includes a downward only escalator clause to protect the state against material and labor price decreases, unless there is clear evidence that purchasing for such longer period is to the advantage of the state. The agreement of purchase shall be on a standard form of contract, and contracts for more than one year shall only be made on approval of the Commissioner of Administration.
However, those types and classes of insurance and bonds under the mandatory jurisdiction of the Louisiana Insurance Rating Commission for rates and/or premium charge and policy form are specifically exempted from the provisions of this Section.
* * * * * * >>
 Plaintiffs further contend that the funds necessary to satisfy the .17^% premium increase were not appropriated by the Legislature at its fiscal session in 1971 and therefore any expenditure in excess of the appropriated funds would be in contravention of Article 4, Section 1, of the Louisiana Constitution of 1921, which states that no money shall be drawn from the Treasury except pursuant to specific appropriation and in further violation of Sections 821 and 851 of Title 42 of Louisiana Revised Statutes, which sections read as follows:
“§ 821. Authority to contract; payment of premiums out of appropriated funds
The state of Louisiana and each of the political, governmental or administrative subdivisions, departments or agencies of the state of Louisiana, and any association of public employees, and the governing boards and authorities of each state university, college, common and independent school districts or of any other agency or subdivisions of the public school system of the state of Louisiana, respectively, may make contracts of group life and group accidental death and dismemberment insurance with any insurance company, legally authorized to do business in this state for the purpose of insuring its employees, officials or heads of departments or any class or classes thereof under policies of group insurance covering the lives of such employees, officials or heads of departments, and agree to pay a portion of the premium, or charges for such contracts out of any funds appropriated for such purposes, provided the amount paid by the state of Louisiana or any of the political, governmental or administrative subdivisions, departments or agencies of the state of Louisiana, and any association of public employees, and the governing boards and authorities of each state university, college, common and independent school districts or of any other agency or subdivisions of the public school system of the state of Louisiana shall not exceed 50% of the premium, out of funds contributed by the State of Louisiana; provided further that such contracts shall be approved by the commissioner of administration of the state of Louisiana, and provided fur *348 ther that such funds are included in their respective budgets; provided further that no reductions of state contributions are to be made on contracts heretofore written and continued in force; provided further that the state of Louisiana, acting through the governor, may procure such contract or contracts for any department, agency or association of employees which are directly responsible to the governor. Acts 1950, No. 508, § 1, as amended Acts 1954, No. 292, § 1; Acts 1956, No. 295, § 1.”
§ 851. Authority to contract; pay-roll deductions for payment of premiums
The state of Louisiana and each of its political, governmental and administrative subdivisions, departments, agencies, association of public employees, officials and department heads, and the governing boards and authorities of each state university, college, common and independent school districts or of any other agency or subdivision of the public school system of the state of Louisiana are authorized to procure contracts insuring their respective employees, officials and department heads, or any class or classes thereof under a policy or policies of group health, accident, accidental death and dismemberment, and hospital, surgical or medical expense insurance, provided they shall not pay in excess of 50% of the premium out of funds contributed by the state of Louisiana, under such contracts, provided further that the state of Louisiana, acting through the governor, may procure such contract or contracts for any department, agency or association of employees which are directly responsible to the governor. The dependents of any such employees, officials, or department heads may be insured under group policies which provide hospital, surgical or medical expense insurance. The employees’, officials’ or department heads’ contributions to the premiums for such insurance issued to the employer or to an association of public employees as the policyholder, may be deducted by the employer from the employees’, officials’ or department heads’ salaries when authorized in writing by the respective persons so to do; provided that the amount paid toward the premium by the state of Louisiana or any of its political, governmental and administrative subdivisions, departments, agencies, association of public employees, officials and department heads, and the governing boards and authorities of each state university, college, common and independent school districts or of any other agency or subdivision of the public school system of the state of Louisiana, shall be subject to the approvál of the commissioner of administration of the state of Louisiana; provided further that no reductions of state contributions are to be made on contracts heretofore written and continued in force; and provided further that said premium must be paid out of funds appropriated for the purpose and included in their respective budgets. Acts 1950, No. 531, § 1, as amended Acts 1956, No. 294, § 1.”
Plaintiffs also urge that it is beyond the power of the Commissioner of Administration to execute a contract on behalf of the State for a period in excess of two years (R.S. 38:2211). They further argue that the expenditure of state funds resulting from the increased premiums amounts to a “gift, grant or donation of a thing of value” belonging to the State of Louisiana in contravention of Article 4 of Section 12 of the Constitution of 1921. Lastly, it is averred that the “renegotiated” premium increase is violative of the price and wage “freeze” announced by the President of the United States on August 15, 1971. The trial judge dismissed these last three contentions without elaborate comment as being without merit and we shall do likewise.
*349 The position of the defendants is that the acquisition of group insurance for state employees is governed solely by the provisions of Title 42 (Public Officers and Employees) of the Revised Statutes and that Sections 821 and 851 are part of Chapter 12 (Group Insurance) and that because these sections specifically authorize the procurement of group life insurance and group health and accident insurance that they are sui generis. Defendants further contend that the requirement for payment of the state’s portion of the premium out of appropriated funds has been fully complied with in each instance.
The trial judge held that Section 171, et seq. of Title 39 and Sections 821 and 851 of Title 42 of the Louisiana Revised Statutes should be considered in pari materia (C.C. Article 17) and in doing so reached the conclusion that whereas Title 42 sanctioned and permitted the purchase of group insurance by the state for the benefit of its employees, Title 39 required that the contract for such insurance could not exceed a period of two years and further that any increase in premium rates would have to result from competitive bidding. On the latter point, the judge a quo also determined that the increased premiums were not included in the budgets for the various agencies for the fiscal year 1971-1972 and that R.S. 42:821 and 851, supra, prohibited any expenditure by the state to cover the increase.
Defendants contend that the trial judge erred in two respects: (1) holding that R. S. 39:171, et seq. are applicable to the procuring or making of contracts by the State of Louisiana of group life and group health insurance for its employees and that such statutory provisions are in pari ma-teria with R.S. 42:821 and 851; and, (2) in holding that the state and its various agencies cannot legally pay the amount necessary to meet the increased premiums because of the provisions found in R.S. 42:-821 and 851, which in substance provide that such payments must be paid out of funds appropriated for that purpose and included in their budgets. We shall discuss these assignments of error in the order mentioned.
The record reflects that immediately prior to the acquisition of the consolidated policies, the employees of the various agencies of the state government were covered by 118 policies issued by some ten to twelve different companies. The policies were not uniform in coverage and the premium rates varied. The record further reflects that in each instance in the past contracts for group coverage of the type herein at issue were obtained by the separate agencies by inviting various companies to submit proposals. The record is also clear that premium rate changes were negotiated in the manner followed by Mr. McDougall.
Mr. McDougall testified that when he received the directive from the governor instructing him to proceed with the consolidation of group insurance he obtained the services of an expert consultant. Specifications were drawn and written bids were accepted and the defendants, Blue Cross and Pan American, were determined to be the low bidders and awarded the contract. The specifications which were offered in evidence required that the contracts provide, for premiums to be guaranteed for the first sixteen months and to be adjusted annually thereafter based upon experience factors. He explained that in October of 1971 the companies notified him that they were experiencing a substantial loss and that the premium rates would have to be adjusted. Blue Cross anticipated the payment of claims during the first year of approximately $11,000,000.00 whereas experience showed that the claims would be in excess of $12,250,000.00. Pan American advised that the average age of the state employees was higher than anticipated because persons of older ages, not participating in prior group programs, elected to subscribe to the new one. The specifications also provided that only 20% of a loss in one premium period could be recouped in any following premium period.
*350 Mr. McDougall stated that upon receipt of notice from the companies of the necessity for premium increases he consulted with persons knowledgeable in the field of insurance and certain agencies affected. He had two alternatives, namely, to permit the policies to terminate at the expiration of the first sixteen months and to seek similar coverage from other companies or to agree to negotiate the amount of the increase. Based on the experience of Blue Cross and Pan American under the existing policies he was advised that premiums under any new company would be higher (particularly in view of the 20% limitation referred to above) and he therefore concluded that the increase of .17(4% was fair and equitable to both the state and its employees. His good faith in this regard is conceded by the plaintiffs and acknowledged by the trial judge. Accordingly, under date of October 12, 1971, he advised the agencies of the increase. He further testified that he thought he was acting pursuant to Title 42, Sections 821 and 851 and in accordance with a practice that had been followed by state agencies in the past. A perusal of the specifications and the policies themselves clearly reflects that the latter were to be experience rated, with annual premium adjustments after the first sixteen months. The only expert testimony in the record is that such clauses are the rule rather than the exception.
With respect to the contention that R.S. 42:821 and 851 should be read in pari materia with R.S. 39:171, et seq., a basic statement of that rule of interpretation of statutes appears in the case of Malone v. Cannon, 215 La. 939, 41 So.2d 837 (1949), at 41 So.2d 843:
“Civil Code Article 17 states that, ‘Laws in pari materia, or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another.’ And in 59 Corpus Juris, verbo Statutes, Section 620, it is said:
“ ‘Statutes in pari materia are those which relate to the same person or thing, or to the same class or persons or things, or which have a common purpose; and although an act may incidentally refer to the same subject as another act, it is not in pari materia if its scope and aim are distinct and unconnected. * * *' ”
We note at the outset that the agencies for which the Division of Administration is responsible under R.S. 39:171 do not coincide with the agencies authorized by R.S. 42:821 and 851 to procure group insurance. R.S. 39:171 specifically excludes the Department of Highways, the Port Authorities of the state, parish or city school boards and parish governing authorities from the mandatory control of the Division of Administration. These numerous agencies may, however, procure group insurance, subject only, for purposes of this comparison, to the approval of the contracts by the Commissioner of Administration. The specific exclusions were incorporated into R.S. 39:171 by Acts 1964, No. 91, or some eight years after the last amendments to R.S. 42:821 and 851. It would be illogical to say that, since the group insurance statutes require mere approval of the insurance contracts by the commissioner, the agencies are also bound by all the same procedural requirements for making this particular purchase as are imposed on the Commission of Administration for other purchases; this conclusion would ignore the later exclusionary provisions of R.S. 39:171. Moreover, the provisions of R.S. 39:171 et seq. necessarily contemplate the expenditure of state funds for purchases, but such expenditures for group insurace premiums are optional; the entire premium might be paid by the employees. It is our opinion that the role of the Commissioner of Administration in reviewing group insurance contracts is related to budgetary considerations with which that division, appropriately enough, is most familiar.
It would be inappropriate for us to say that the Department of Highways or any *351 other agency, board or commission which are specifically excluded from R.S. 39:171, et seq. are now bound by its provisions simply because an effort was made to consolidate coverage for the purpose of assuring that all employees from whatever agency, board or commission, falling within the purview of R.S. 42:821 and 851 are to be treated equally. Mr. McDougall’s role in this instance is of no greater or lesser significance than that of any other agency head or director of any board or commission who previously and individually procured similar policies for the benefit of the employees under him.
The move to consolidate insurance coverage of all state agencies, boards and commissions was the result of the governor’s proclamation, aforementioned, and not by any legislative mandate. Hence, the basic law applicable here has not changed since the Legislature saw fit to last amend the provisions of either Title 39 or 42. It is for this additional reason that we do not construe the pertinent provisions of Title 39 and Title 42 in pari materia. If the Legislature had intended for all “political, governmental and administrative subdivisions, departments, agencies, association of public employees, officials and department heads, and the governing boards and authorities of each state university, college, common and independent school districts or any other agency or political subdivision of the public school system of the state of Louisiana” to be governed by Title 39, it could have said so. To place any one agency, etc., in a different position from that of another, is to change the scope and aim of the clear provisions of R.S. 42:821 and 851. We can reach no other conclusion but that no such legislative intent is reflected in Sections 821 and 851 relative to group insurance. Hence, the subject statutes are not in pari materia with R.S. 39:171, et seq. and the trial judge committed an error in law in construing them to be so. Further, if R.S. 39:171, et seq., are read in pari ma-teria with R.S. 42:821 and 851, then there results an irreconciliable conflict. R.S. 39:171 is mandatory in requiring the Commissioner of Administration to purchase all supplies, equipment and other commodities, including insurance, for all state agencies which are not specifically excepted. R.S. 42:821 and 851 authorize those same agencies, acting independently from one another, to procure group insurance for their employees. Those agencies cannot be prohibited from making purchases independently by R.S. 39:171 and at the same time be authorized to make an independent purchase of group insurance by R.S. 42:821 and 851. Either the Commissioner of Administration alone must purchase such insurance, subject to the requirements of R. S. 39:171, et seq., or each agency may do so subject- only to the limitations imposed by R.S. 42:821 and 851. To say that these statutes are the same in purpose and scope is to necessitate the conclusion that R.S. 39:171, et seq., have repealed, insofar as the included agencies thereunder, the authorization granted by R.S. 42:821 and 851. Because of this hopeless conflict, we cannot conclude that the legislature intended these statutes to be identical in purpose and scope and thus read in pari materia.
We now turn to the issue of whether or not the funds contributed by the state are “appropriated . . . and included in . . . ” the budgets of the agencies concerned within the meaning of R.S. 42:-821 and 851. We conclude that the statutes have been satisfied and that the necessary funds are appropriated. The record discloses, and the factual issues involved are not disputed, that each agency prepares a “line item” budget for presentation to the governor for preparation of the Executive Budget submitted by him to the Legislature. The Legislature reviews the budget on a “line item” basis. Like the governor’s proposed budget, the Legislature increases some items and reduces the amounts for other items. However, the General Appropriations Bill (Act 12 of 1971) contains only the total sum appropriated for the particular budget unit. After the adoption of the General Appropriations Bill, each budget unit then revises its “line item” *352 budget to conform to the funds appropriated. The agencies then resubmit their revised budget to the Division of Administration and this budget forms the basis for the fiscal operation of the agency. Funds are obtained by drafts drawn on the state treasury monthly based on previously submitted quarterly estimates. It is the joint responsibility of the agency director and the Commissioner of Administration to see that each agency operates not only within its budget but also adheres to its “line item” budget.
The agency fiscal officers testified that their respective budgets are constantly being revised to provide for more funds for a particular purpose where there is a surplus or balance left for another item, or to establish priorities where there is no surplus or contingency funds. The adjustment or changing of funds from one item to another is authorized by Section 5 of Act 12 of 1971 (the General Appropriation Bill) which reads as follows:
Section 5. The expenditures of the departments and agencies for which appropriations are made herein and the incurring of obligations to spend money shall conform strictly to the category of expenditures as specified in the allotments established in each agency’s budget. The Commissioner of Administration, with the approval of the Legislative Budget Committee, is authorized to approve the transfer of funds, except those funds appropriated for salaries, step increases, and merit increases for personnel in the classified service of the State of Louisiana, from one category of expenditures to another. But such transfer shall only be made when sufficient evidence is presented indicating that the operations of the unit are being or will be impaired without such transfers. All unauthorized transfers from one allotment category to another will be charged against the appropriation for the next year.
Again, the unit fiscal officers testified that the portion of the premium increase to be paid by the state would be paid out of funds previously appropriated but in all probability exchanged from another “line item” to that of insurance. None expressed apprehension about not having sufficient funds to satisfy the increase. Admittedly, the trial of this cause was conducted prior to the necessity for any budget unit to have already made an adjustment. One agency thought that the funds would be available in the “insurance” item alone because of attrition within the department. Another officer stated that if the insurance item was deficient and funds were not available from other items, that the director could fall back on an emergency fund.
The practice of transferring funds from one item to another is common and is stated to be necessary in the operation of certain departments involving vast sums of money. Undoubtedly the necessity for the transfer of funds from one item to another was recognized by the legislature and Section 5, supra, or similar provisions have been contained in each general appropriations bill since 1963. The executive and legislative branches of our government are thus satisfied that public funds are spent for the purposes for which they were requested and appropriated by requiring the joint consent of the Commissioner of Administration and the Legislative Budget Committee to approve any change in or alteration of the original “line item” budget. This procedure in our opinion, as sanctioned by Section 5, supra, satisfies the appropriation requirement.
Lastly, plaintiffs argue that Section 5 of Act 12 of 1971 is unconstitutional in that it violates Article IV, Section 9 of the Louisiana Constitution which provides that a general appropriations bill shall embrace nothing but appropriations for the ordinary expenses of government. We view Section 5 as being incidental to the fiscal management of the funds expressly appropriated in the act and is therefore not in contravention of the Constitution. See State ex rel. Assistant District Attorneys Association et *353 al. v. Theriot, Comptroller of the State of Louisiana et al., La.App., 242 So.2d 49.
Accordingly, for the above and foregoing reasons the judgment of the District Court is reversed and the permanent injunction therein granted is recalled, vacated and set aside and this suit is dismissed with prejudice at plaintiffs’ costs.
Reversed and rendered.
ELLIS, J., recused.