**INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES, Appellant,**

v.

**HARTFORD ACCIDENT AND INDEMNITY CO., Appellee.**

**No. 12383.**

District of Columbia Court of Appeals.

Argued Jan. 3, 1978.

Decided May 22, 1978.

David S. Barr, Washington, D. C., with whom William B. Peer, Washington, D. C., was on the brief, for appellant.

Thomas Penfield Jackson, Washington, D. C., for appellee.

Barry R. Ostrager, Simpson Thacher & Bartlett, New York City, Martin E. Segal & Co.

Before KERN, GALLAGHER and YEAGLEY, Associate Judges.

GALLAGHER, Associate Judge:

Appellant International Brotherhood of Painters and Allied Trades (the Union) filed suit against appellee Hartford Accident and Indemnity Company (Hartford) and an independent insurance consulting firm, Martin E. Segal Company (Segal). With respect to Hartford, the Union requested a temporary restraining order and preliminary injunction,[1] as well as a declaratory judgment and money damages all on account of an alleged breach of contract, arising from Hartford's unilateral cancellation of the policy. Hartford opposed those requests and moved for summary judgment. After appropriate hearings,[2] the trial court denied the Union's motion for the preliminary injunction and granted Hartford's motion for summary judgment. Upon certification by the trial court under Super.Ct.Civ.R. 54(b)—a procedure brought about by the presence of the other defend-

ant, Segal, to whom summary judgment was not applicable—the Union brought this appeal. It makes three arguments: (1) summary judgment was improper because of the existence of an issue of material fact as to which a genuine dispute exists; (2) the trial court erred in holding that Hartford had the right to cancel the policy; and (3) the court erred by not according controlling weight to testimony and evidence of the entire agreement between the parties.

The Union is the parent organization for approximately 800 local unions of painters, glaziers, and the like, engaged in traditional trade union activities. Its governing board, known as the General Executive Board, consists of the Union's General President, its General Secretary-Treasurer, and seven General Vice Presidents. The Union meets in general convention at five-year intervals. In 1973, in anticipation of a forthcoming general convention in 1974, the Board requested an independent insurance broker, McLaughlin & Co. (McLaughlin) to solicit bids on its behalf from commercial insurance carriers for a group accidental death and dismemberment policy for the Union with the condition that it have a policy for five years with no changes. More particularly, it sought a contract with a premium which would be guaranteed to remain constant for five years.[3] The guarantee of a constant premium was sought because the Union budgeted for five-year periods between general conventions, adopting a dues schedule for individual members which would provide the necessary revenues to meet expenses until the next convention.

1. The Union sought a temporary restraining order—to be effective until a hearing could be held on its motion for a preliminary injunction—to enjoin Hartford from cancelling its policy of insurance with the Union and from threatening to increase the fixed premium rate. Although it is not entirely clear from the record, apparently the trial court granted the Union's request for the temporary restraining order pending the court's ruling on the motion for a preliminary injunction.

2. Extensive hearings were conducted before the trial court on the motion for a preliminary injunction. A separate subsequent hearing—which would have been mostly repetitious—

was not held on Hartford's motion for summary judgment. Rather, after denying the motion for a preliminary injunction from the bench, the court heard both parties argue on the motion for summary judgment. The court then took the matter under advisement until issuance of its written order granting the motion.

3. According to the testimony of one of the employees of Hartford, insurance policies can also be guaranteed as "non-cancellable" as well as guaranteed as to a fixed rate for a specified period if requested by a prospective insured.

McLaughlin solicited bids from various carriers, including appellee Hartford, and presented the proposals received from those carriers to the Union's General Executive Board. The Board, with the Union's general counsel participating, considered the proposals at meetings in October and November of 1973. Four carriers had submitted proposals: Hartford, Continental Casualty, General American, and Union Labor insurance companies. Hartford's proposal was generally embodied in a sample policy which contained a provision setting forth a five-year guaranteed rate of $.54 per $1,000.[4] (Plaintiff's Exhibits Nos. 19 and 20.) It was transmitted to McLaughlin by the manager of the special risk department of Hartford's Washington office. The proposal, however, had been formulated at Hartford's home office in Hartford, Connecticut, under the supervision of an Assistant Vice President.

Sometime following the November 1973 meeting of the Board the Union employed Segal, which had been actuary and consultant to the Union on pension and health plans for many years, to negotiate as its representative for accidental death and dismemberment insurance on better terms than those proposed. The Union's General Secretary-Treasurer instructed Hartford henceforth to deal directly with Segal as the Union's agent. Accordingly, a second sample policy was sent to Segal.[5] Both sample policies contained a section known as the General Provisions (Section VI) which provided in Paragraph 1 thereof:

> Cancellation: The Company may cancel this policy at any time by written notice delivered to the Policyholder or mailed to its last address as shown on the records of the Company stating when, not less than 30 days thereafter, such cancellation shall be effective; and after the policy has been continued beyond the first policy

anniversary date the Policyholder may cancel this policy at any time by written notice delivered or mailed to the Company effective on receipt or on such later date as may be specified in the notice. In the event of such cancellation by either the Company or the Policyholder, the Company shall promptly return on a pro rata basis the unearned premium paid, if any, and the Policyholder shall promptly pay on a pro rata basis the earned premium which has not been paid. Such cancellation shall be without prejudice to any claim originating prior to the effective date of such cancellation.

The sample policies also contained a Section VII, known as the Policy Provisions, of which Paragraph 1 stated:

> Entire Contract: Changes; This policy, including the endorsements and the attached papers, if any, constitutes the entire contract of insurance, and no statement made by the Policyholder or by an Insured Person whose eligibility has been accepted by the Company shall be used in defense to a claim hereunder. No change in this policy shall be valid until approved by an executive officer of the Company and unless such approval be endorsed hereon. No agent has authority to change this policy or to waive any of its provisions.

In early February 1974, the General Executive Board met again, and John F. Gentleman, a Vice President of Segal, presented the proposals to the Board, accompanied by a written memorandum stating that the "contractual provisions" of the four proposals, as he saw them, were "similar enough to call even."[6] With respect to the cancellation clause, Mr. Gentleman advised the Board that it was a "standard" provision which merely permitted Hartford to cancel "in case of non-payment of premiums or

---

**4.** Although one of the sample policies provides for an annual rate of $.54 per $1,000 (Plaintiff's Exhibit No. 20), we note that the final policy provides for an annual rate of $.51 per $1,000

(based on a monthly rate of $.0425). Plaintiff's Exhibit No. 11.

**5.** Plaintiff's Exhibit No. 21.

**6.** The proposals submitted by the other three

some similar circumstances."[7] In any event, the Union never sought deletion of the cancellation clause.

The Board voted to pursue the Hartford proposal and, on March 4, 1974, Mr. Gentleman wrote to Hartford's Washington special risk manager accepting the Hartford proposal on behalf of Segal's client at an annual premium of $.51 per $1,000 of coverage per member to December 31, 1979, assuming the coverage to be standard, with the amount, age limitations, premium rebates, and payment of commissions yet to be agreed upon. He specified in the letter that "[a]s outlined in your proposal, the annual rate of $.51 per $1,000, based on a guarantee of this rate, will remain in force without change, either upward or downward, until December 31, 1979."

On April 3, 1974, Hartford's home office answered Mr. Gentleman's letter, stating that Hartford was pleased to learn that the proposal had been accepted. It also advised Mr. Gentleman, however, that Hartford was not accepting "any of the terms outlined in . . . [Mr. Gentleman's] letter." Despite that ambiguous disclaimer, the Hartford letter continued by reaffirming its rate guarantee: "[w]e will guarantee that our annual rate of 51¢ per $1,000 of principal sum will remain in force without change, upward or downward, *until December 31, 1979 based on an initial effective date of January 1, 1975.*" (Emphasis added.) In a subsequent paragraph, Hartford advised Mr. Gentleman that "[p]rovisions of the contract, as shown in the proposal, will be the ultimate contractual provisions governing this policy, except as modified by mutual agreement at any future date."[8]

Following clarification of the amount of coverage to be obtained, and the cost, with

commissions, to the Union at a premium rate Hartford guaranteed not to raise for five years, the Board voted in June of 1974 to purchase $2,000 coverage for each Union member. The Union's membership approved the action in General Convention in September of 1974, and then voted a monthly dues increase of 9 to 10 cents per member to finance the cost of the insurance.

Effective January 1, 1975, Hartford issued its Policy No. ADD 1796, providing accidental death and dismemberment coverage of $2,000 for each union member at a monthly premium of $.0425 per $1,000 "subject to the limits of liability, exclusions, conditions and other terms of this policy. . . . ." Among the "conditions and other terms" was the cancellation clause, Paragraph 1 of the General Provisions (Section VI) which had appeared in both sample policies submitted with Hartford's proposal. The policy omitted the five-year guarantee language which had been in the sample policies submitted by Hartford.[9]

The Union accepted the policy as issued and paid the premiums at the specified rate throughout 1975. Although the Union calculated that Hartford had actually netted approximately $38,000 in 1975, Hartford calculated its 1975 experience as entailing nearly a $95,000 net underwriting loss on the policy. In November of 1976, confronted with what was then projected to be a net underwriting loss for the current year in excess of $100,000 (and an estimated loss for the entire five-year period of more than $500,000), Hartford sent its local special risk manager to attempt to negotiate a substantial premium increase or a reduction in coverage or else to cancel the policy. The General Secretary-Treasurer of the Union

---

carriers were not before the court.

7. The sample policies also contained a Paragraph 2(d) of the General Provisions which provided that the coverage would lapse, after a 31-day "grace period," for nonpayment of premiums.

8. Paragraph 2(e) of the General Provisions of the sample policies and the final policy provides that Hartford can unilaterally "change

the rate at which further premiums . . . shall be computed" at each policy anniversary date. Plaintiff's Exhibits Nos. 11, 20, and 21. This provision of the contract appears to contradict the agreed upon five-year rate guarantee. Its inclusion casts doubt upon Hartford's position that the policy represents the unambiguous agreement of the parties.

9. Plaintiff's Exhibit No. 11.

refused to renegotiate the rates. On November 30, 1976, Hartford exercised its asserted right of cancellation (under the general clause), the effective date, however, to be postponed to April 1, 1977 to enable the Union to procure alternate coverage. This suit followed, challenging the right of Hartford to cancel the policy.

After comprehensive hearings, the trial court granted appellee's motion for summary judgment because it found the cancellation clause to be "an independently-reserved right of either party to cancel the policy." In concluding as it did, the trial court first recited in full the cancellation clause and then set forth the following rationale in its order:

"When the insurance contract gives either party an absolute right of cancellation, such provision will be strictly construed and any notice conveying the intention to cancel will be effective." *Johnson v. Nationwide Mutual Insurance Company,* 276 F.2d 574 (4th Cir. 1960). See also *Hartford Accident and Indemnity Company v. Hartley,* 275 F.Supp. 610 (M.D.Ga.1967), aff'd 389 F.2d 91 (5th Cir. 1968). "When the right to cancel had been reserved by the parties, they may do so regardless of their reasons or motives."

The court then went on to state:

2. The cancellation clause was clearly printed in the policy itself, as well as in all samples and proposals submitted to the plaintiff. Plaintiff is a large organization which has access to professional legal advice. Since the cancellation clause is apparent in all of the relevant documents, plaintiff's claim that no officers of the General Executive Board or legal counsel noticed the existence of the cancellation clause is not sufficient to negate the impact of the right to cancel.

3. Even if there was a tacit stipulation between the parties that the insur-

ance policy was to include a five year guaranteed *rate* of payment of premium, the nonability to adjust premium rates either upward or downward does not alter an independently-reserved right of either party to cancel the policy. The Court carefully considered all parol evidence presented at the May 4th and May 6th hearings for preliminary injunction concerning the five year guaranteed rate. See *Luther Williams, Jr., Inc. v. Johnson,* 229 A.2d 163 (D.C.C.A.1967). The admission of any such parol evidence is not material to the issue of the controlling effect of the cancellation clause.

4. Therefore, the Court finds that there is no issue or dispute as to any material fact in this case and grants Summary Judgment in favor of defendant Hartford Accident and Indemnity Company as a matter of law.

The Union's argument focuses primarily on the negotiations of the parties prior to the actual issuance of the policy. It argues that the essence of the insurance policy was a clause guaranteeing the premium rates for five years, even though it accepted the policy without that clause being expressly included. Furthermore, it contends that this clause guaranteeing premium rates for five years supersedes, to the extent inconsistent, the cancellation clause.[10]

Hartford, on the other hand, responds that the right to cancellation by either party must be determined solely pursuant to the express cancellation provision. It argues that by guaranteeing a constant premium for five years Hartford undertook only to obtain the Union's consent before increasing premium charges which it might otherwise have done unilaterally, without notice, on the policy anniversary date—forcing the Union either to pay the increased premiums or to forfeit the policy after thirty-one days if it chose not to pay

---

10. The Union also argues that the cancellation clause, although not so restricted by its terms, can only be invoked for nonpayment of premiums or like situations. Apparently, the Union's interpretation stems from advice of Segal as to the meaning of that clause. Notably, the sample and final policies contained a Paragraph

2(d) of the General Provisions which provided that the coverage would lapse, after a thirty-one day grace period, for nonpayment of premiums, but specifically subject to the right of the insurer to cancel the policy pursuant to the general cancellation clause, Paragraph 6, during this grace period.

them.[11] It points out that, had the situation been reversed—such that the Union was losing money on its insurance policy due to minimal benefits or exorbitant premiums—the Union most likely would have availed itself of the cancellation clause in order to seek a better bargain elsewhere.

We start our analysis with an examination of the contract of insurance, in order to explore the respective rights of the parties to the insurance policy. *Oler v. Liberty Mutual Insurance Co.*, D.C.App., 297 A.2d 333, 335 (1972), *citing* 1 Couch on Insurance 2d, § 15:1 (1959). The contract here, which was presented to the Union's Board—in the presence of its general counsel—by its insurance consulting agency (Segal), contained no language concerning a guaranteed rate for even one year, much less for five years. Furthermore, it contained—just as did the sample policies previously submitted—the cancellation provision at issue here. Yet, the Board ratified this policy as submitted without objecting to the omitted guarantee or to the very broad cancellation provision.[12] Considering that the Union's desire for a five-year, noncancellable, guaranteed premium rate was such an important element of this transaction—if not the most important—the Union's failure to seek clarification or amendment of the rate provision and cancellation provision is a grave oversight. Based on the terms of the final contract of insurance *alone*, Hartford had the right to cancel as it did.

The contract of insurance does not, standing alone, appear to express the parties' final and entire agreement. Importantly enough, however, despite the fact that the contract of insurance does not contain the five-year guarantee clause—which was contained in the sample policies submitted to the Union—Hartford admits that it did guarantee a constant premium rate for five years. Thus, Hartford's brief states:

> In guaranteeing a constant premium for five years Hartford undertook only to obtain the Union's consent before increasing premium charges which it might otherwise have done unilaterally, without notice, on the policy anniversary date, leaving the Union without recourse except to pay the increased premiums or to forfeit the policy after 31 days if it chose not to pay them. Hartford undertook no larger obligation by its guarantee of rate than to require the concurrence of both parties to an alteration of premiums during the succeeding five years. If it should be held to have guaranteed *coverage* for five years as well, in spite of the cancellation clause, then the contract will have been made by the court, not by the parties.[13]

Hartford makes that admission in the face of a contractual provision which expressly and unambiguously purports to give the insurer the right to change the rates unilaterally on each anniversary date of the policy.[14] The question then becomes whether, and to what extent, the omitted guarantee clause modifies, or supersedes, other arguably inconsistent contractual provisions. In order to construe the insurance agreement as a whole—particularly the guarantee clause vis-a-vis the cancellation clause—there must first be a determination of the meaning and scope of the guarantee clause.

 The trial court made no explicit finding as to the meaning of the guarantee,[15] nor could it, nor should it have made

---

11. Presumably (although not noted by Hartford), the Union would also be able to cancel pursuant to the cancellation provision.

12. The issue of the Union's justifiable reliance—especially in light of its counsel's presence—upon Segal's representation as to the interpretation of the cancellation clause is still pending before the trial court. Consequently, we express no opinion as to the ultimate responsibility for the Union's interpretation of that provision or its failure to call into question

the omission of the guarantee clause—insofar as the Union and Segal are concerned.

13. Brief for Appellee at 9.

14. *See* note 8 *supra*.

15. The trial court did not find that the five-year rate guarantee was a part of the contract of insurance between the parties. Rather, the trial court said that even assuming such a guarantee were part of the policy, "the nonability to adjust premium rates either upward or down-

such a determination on a motion for summary judgment.

Summary judgment is only appropriate when no genuine issue of material fact exists. *Bullard v. Curry-Cloonan*, D.C.App., 367 A.2d 127, 130 (1976); Super.Ct.Civ.R. 56(c). In determining whether a genuine issue of material fact exists, we must review the whole record in the light most favorable to the party opposing the motion—*i. e.*, appellant. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bennett v. Kiggins*, D.C.App., 377 A.2d 57, 59 (1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). As this court stated in *International Underwriters, Inc. v. Boyle*, D.C.App., 365 A.2d 779, 782–83 (1976):

> In order to survive the summary judgment motion, the opposing party need only show that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of truth at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 . . . (1968). Summary judgment is appropriate only where "it is quite clear what the truth is . . . ." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 624 [64 S.Ct. 724, 88 L.Ed. 967] . . . (1944). A doubt as to whether or not an issue of fact has been raised is enough to preclude a grant of summary judgment. *Washington Post Co. v. Keogh*, 125 U.S.App. D.C. 32, 34, 365 F.2d 965, 967 (1966).

We think that more than a doubt has been raised as to the existence of a genuine issue of material fact, *viz.*, the intent of the parties, at the time of contracting, as to the meaning of the five-year rate guarantee. Consequently, we must reverse and remand for a trial on appellant's claim against Hartford.[16]

The sample contract submitted by Hartford contains the guarantee clause which is the subject of this dispute, and which Hartford concedes on appeal was a part of the final policy, although not specifically contained therein. The clause reads, in pertinent part, as follows: "The premium for this policy is to be determined and be due as follows: Plan I—5 Year guaranteed rate of $.54 per $1,000.00" [17]

We are aware that we must not seek out ambiguities when the language has just one clear meaning. *Belland v. American Automobile Insurance Co.*, D.C.Mun. App., 101 A.2d 517, 518 (1953), and that when the meaning of a provision is unambiguous "its construction is a matter of law for the court . . . ." *Rich v. Sills*, D.C. App., 130 A.2d 920, 922 (1957); *United Services Life Insurance Co. v. Ringsdorf*, D.C.Mun.App., 91 A.2d 717, 719 (1952). However, giving to the phrase "5 Year guaranteed rate" the plain meaning which common speech imports, *Dryer v. Liberty Mutual Insurance Co.*, D.C.App., 248 A.2d 504, 505 (1968), we think it reasonably susceptible of different constructions when considered in conjunction with the broad cancellation provision. Consequently, there is ambiguity. *See United Services Life Insurance Co. v. Ringsdorf, supra* at 719. The question may arise as to what benefit inures to an insured who specifically bargains for a five-year premium rate when the insurer may cancel at any time and for any reason—including the failure of the insured to agree to a substantial premium rate increase after less than two years, which is what happened here. The Union argues that Hartford is only authorized to cancel, pursuant to the contract, for nonpayment

---

ward does not alter an independently-reserved right of either party to cancel the policy." Thus, in effect, the court *conditionally* found as a fact the scope of the meaning of the guarantee clause—which depends upon a resolution of the dispute between the parties on an issue of fact, *i. e.*, the parties' intent, as gleaned from the extrinsic evidence.

**16.** As this court said in *1901 Wyoming Avenue Cooperative Ass'n v. Lee*, D.C.App., 345 A.2d 456, 461 (1975), "Where genuine issues of material fact exist, the parties are entitled to the due consideration provided by a full trial, even if the record before the motions judge has developed the facts as fully as a trial might."

**17.** Plaintiff's Exhibit No. 20.

of premiums, or similar breaches of the contract's provisions. Hartford argues, on the other hand, that the guarantee clause only refers to the necessity for the insurer to secure the insured's consent to changes in the premium rate, rather than the insurer being able to change the rate unilaterally.[18] Hartford's explanation of the meaning of the guarantee clause is not apparent from the plain language in the policy.[19] Thus, Hartford, too, is stating in necessary effect that the meaning of the clause is ambiguous and must be explained by extrinsic evidence.[20]

When confronted with an integrated insurance agreement which contains ambiguous terms, the court must examine and interpret the policy "through the eyes of the reasonable purchaser."[21] *1901 Wyoming Avenue Cooperative Ass'n v. Lee,* D.C. App., 345 A.2d 456, 461 & n. 9 (1975), *citing Messina v. Mutual Benefit Health and Accident Association,* 228 F.Supp. 865, 868 (D.D.

C.1964), *aff'd,* 121 U.S.App.D.C. 328, 350 F.2d 458 (1965), *cert. denied,* 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1966).[22] In interpreting ambiguous provisions, there must be resort to parol evidence and an exploration of extrinsic circumstances. *Rich ·v. Sills, supra* at 922. Particularly significant is extrinsic evidence concerning the parties' negotiations prior to and contemporaneous with the formation of the agreement, as well as their course of conduct under the contract. *1901 Wyoming Avenue Cooperative Association v. Lee, supra* at 461–63.

When there is " '[a] question of interpretation of an integrated agreement [it] is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.' " *1901 Wyoming Avenue Cooperative Association v. Lee, supra* at 461 n. 8,

18. The following statement contained in 5 Couch on Insurance § 30:11 (2d ed. 1959) directly contradicts Hartford's assertion: "Once the rate . . . is agreed to by the insurer and the insured, it is as binding upon both as any other contract term and cannot be changed without their common consent." (Footnote omitted.) *See also id.* at § 30:16. When, however, an insurer wishes to change the premium rates due to the costs it incurs based on actual experience under the policy, the insurer may so provide in the policy. *Id.* at § 30:17. For example, in *Bussie v. McKeithen,* 259 So.2d 345 (La.Ct. of App.1971), the Commissioner of Administration of Louisiana had negotiated for and entered into policies which "contained provisions guaranteeing the premium rate for the first sixteen months with the provision that thereafter the premium rates could be annually modified to effect an increase or decrease in the event experience under the policies so dictated." 259 So.2d at 346. No such clause was used here to refer to rate changes based on experience.

19. The meaning of the guarantee clause and its effect on Hartford's ability to cancel were questioned by the special risk manager of Hartford's Washington office—the representative of the insurer with whom most of the Union's negotiations were conducted. Prior to his meeting with the Union to try to renegotiate the premium rate, he sent the following interoffice memo to Hartford's home office:

Before I set up anything I want to be sure we can *legally* cancel coverage per section VII, Item 1 in view of the 5 year rate guarantee. I

agree it would be nice to get an increase—but I also want to be practical. What good is any guarantee if we can cancel. Don't wait too long on this one. [Emphasis in original.] He received the following response: "[John Harrington's] . . . attached memo to file points out that our legal dept. feels that we can give notice of cancellation to the policyholder and remain within our contractual rights, regardless of the rate guarantee. Good luck and keep us informed."

20. Furthermore, as noted previously this guarantee tends to contradict General Provision paragraph 2(e), concerning Hartford's unilateral right to renegotiate premium rates on every policy anniversary date. *See* note 8 *supra.* Consequently, extrinsic evidence is also necessary to explain that seeming contradiction.

21. The fact that the Union had an attorney—its General Counsel—present, as well as the services of an independent insurance consulting firm, appears to be a relevant consideration in assessing the reasonableness of Hartford's interpretation of the contract.

22. It is a well established legal principle that insurance policies—and ambiguities contained therein—are to be construed in favor of the insured and against the insurer which prepared the policy. *Raley v. Life & Casualty Insurance Co. of Tennessee,* D.C.Mun.App., 117 A.2d 110, 113 (1955); *Belland v. American Automobile Insurance Co., supra* at 518.

*quoting in part,* Restatement of the Law Second, Contracts 2d, Tentative Drafts Nos. 1–7, at § 238(a) and Comment d (1973); *see also* 22 Appleman, Insurance Law and Practice § 12853, at 6–8 & nn. 34, 36, 39–40 (1947 & 1977 Supp.) *But see id.* at § 12853, at 6–7 & n. 35. Here the trier of fact must resolve the dispute as to what the parties meant by the guarantee clause, with reference both to extrinsic evidence and to the various rules of contract interpretation and construction, particularly as they relate to insurance policies.[23] We reverse and remand for further proceedings.

*Reversed and remanded for further proceedings consistent with this opinion.*

---

**23.** Pertinent rules of interpretation and construction of insurance policies are set forth in 1 Couch on Insurance § 15 (2d ed. 1959). For example, when reasonably possible, the court should give effect to all provisions, and not construe the various portions of the policy so as to neutralize the meaning and effect of one provision. *Id.* at § 15:43. Rather, all provisions should be construed consistently with each other. *Id.* When, however, an ambiguity exists as to the meaning and effect of different provisions, the usual rule is that the special provisions control over the more general ones, *id.* at § 15:70, and the typewritten clauses prevail over the printed ones. *Id.* at § 15:72. This treatise notes that the ambiguities or provisions relating to cancellation be construed strictly against the insurer. *Id.* at Vol. 17, § 67:59 (footnote omitted).