The COLORADO GENERAL ASSEM-
BLY, Plaintiff-Appellee,

v.

The Honorable Richard D. LAMM, Gov-
ernor of the State of Colorado,
Defendant-Appellant,

and

The COLORADO GENERAL ASSEM-
BLY and the Colorado General Assem-
bly on Behalf of the People of the State
of Colorado, Plaintiff-Appellee and
Cross-Appellant,

v.

The Honorable Richard D. LAMM, Gover-
nor of the State of Colorado, Defend-
ant-Appellant and Cross-Appellee,

and

Roy Romer, Treasurer of the State of
Colorado, James A. Stroup, Controller
of the State of Colorado, R. Garrett
Mitchell, Executive Director of the De-
partment of Administration of the State
of Colorado, and Lumbermens Mutual
Casualty Company, Defendants.

No. 83SA381.

Supreme Court of Colorado,
En Banc.

May 6, 1985.
Rehearing Denied May 28, 1985.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard Forman, Sol. Gen., Denver, Colo., for defendant-appellant and cross-appellee.

Welborn, Dufford & Brown, Philip G. Dufford, Gregory A. Ruegsegger, Denver, Colo., for plaintiff-appellee and cross-appellant.

KIRSHBAUM, Justice.

This appeal involves questions concerning the authority of the chief executive of the State of Colorado to transfer funds from the departments of the executive branch of government for which the funds were appropriated to other executive departments. Specifically, the appeal is brought by the Honorable Richard D. Lamm, as Governor of the State of Colorado, from a judgment of the trial court in two consolidated civil actions originally filed against the Governor and others by the Colorado General Assembly seeking a judicial declaration that certain transactions undertaken by the Governor were not authorized. The trial court concluded that one of the transactions was authorized and that the others were not. The General Assembly has filed a cross-appeal in one of the cases. We affirm in part, reverse in part and remand for further proceedings.

### I. *Facts*

The basic facts giving rise to the filing of the two suits are not in dispute, although the parties are in sharp conflict with regard to the significance of those facts. On August 28 and September 18, 1980, the Governor, by executive orders, authorized the transfer of $2,475,000 to various accounts of the Department of Corrections from accounts in other executive departments.[1] The transferred sums represented

---

1. On August 28, 1980, Governor Lamm issued a memorandum to the Executive Director and the State Budget Director of the Office of State Planning and Budgeting and to the State Controller and the Executive Director of the Department of Administration which authorized fund transfers "to meet extraordinary needs arising out of funding shortfalls in the Department of Corrections for both the capital construction and the operating budgets." The memorandum stated that "[t]he funds to be transferred are to be obtained from [specific] line items" which contained estimated reversions, *i.e.,* appropriated funds not spent. The memorandum further instructed the officials to use "[o]ther reversions ... as required should any of these items not reach expected levels."

The identified sources provided sufficient total funds for the transfers. The funds, totalling $2,475,000, came from the following departments and line items:

| Department and Line Item | Amount |
| --- | --- |
| Education-Public School Finance Act, Low Income Equalization | $305,965.81 |
| Education-Public School Finance Act, Increasing Enrollment Equalization | 733,787.73 |

"reversions," *i.e.*, appropriated funds not spent during the fiscal year for the purposes for which they were appropriated. These funds had been appropriated by the General Assembly for the state fiscal year ending June 30, 1980. Had they not been expended, the funds would have been reverted ("reverted") to the state general fund or a special fund by the executive branch departments for whose programs the original appropriations had been made.

These transfers were deemed essential by the Governor because the General Assembly was not in session and, under a decision of the United States District Court for the District of Colorado, *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *aff'd in part*, 639 F.2d 559 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), it was essential that the Division of Correctional Industries of the

Department of Corrections complete construction of a new maximum security prison facility by December 30, 1980. The Department of Corrections was unable to finance completion of that project by the end of the year from its appropriated funds. The Governor consulted with the Joint Budget Committee of the General Assembly concerning this situation and informed that body of his decision to meet the perceived fiscal crisis by means of these transfers.

In Civil Action No. 81CV10058, filed November 19, 1981, the General Assembly alleged that these 1980 transfers violated article III of the Colorado Constitution and sections 32 and 33 of article V of the Colorado Constitution.[2] The General Assembly also asserted that the transfers violated section 24–75–102, 10 C.R.S. (1973),[3] sec-

| Department and Line Item | Amount |
|---|---|
| Education-School District Distributions Emeritus Retirement | $52,323.68 |
| Administration, Accounts and Control-Retirement Benefits-School and Municipal | 99,487.16 |
| Administration, Accounts and Control-Retirement Benefits-State Employees | 52,096.32 |
| Administration, Executive Director, Utilities Contingency Reserve. (This transfer was made from net savings on utilities in several agencies.) | 160,000.00 |
| University of Colorado, Boulder Campus-ADP Operations | 70,255.05 |
| Social Services-Assistance Payments, Aid to the Needy Disabled, State Only Programs | 369,981.10 |
| Institutions, Division of Developmental Disabilities-Community Programs, Community Center Basic Programs | 631,103.15 |

On September 18, 1980, the Executive Order of August 28 was cancelled and $1,599,000 which had been appropriated by the Order for construction projects was "reappropriated by the Governor to Correctional Industries as an operating subsidy from the General Fund." The September Order did not alter the sources of the transferred funds.

**2.** These constitutional provisions are as follows:
The powers of the government of this state are divided into three distinct departments,—

the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.
Colo. Const. art. III.
**Appropriation bills.** The general appropriation bill shall embrace nothing but appropriations for the expense of the executive, legislative and judicial departments of the state, state institutions, interest on the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.
*Id.* art. V, § 32.
**Disbursement of public money.** No moneys in the state treasury shall be disbursed therefrom by the treasurer except upon appropriations made by law, or otherwise authorized by law, and any amount disbursed shall be substantiated by vouchers signed and approved in the manner prescribed by law.
*Id.* art. V, § 33.

**3.** At the time Civil Action No. 81CV10058 was filed, section 24–75–102, 10 C.R.S. (1973), provided as follows:
**Appropriations expended, when—balance.** Except as otherwise provided by law, all moneys appropriated by the general assembly may be expended only in the fiscal year for which appropriated, and any moneys unexpended from the appropriation for any fiscal year shall revert to the general fund or, if made from a special fund, to such special fund. Any moneys appropriated shall be deemed to

tions 24–75–201.1,[4] –201.2,[5] –302 [6] and –303,[7] 10 C.R.S. (1982), and certain administrative regulations. The suit was instituted subsequent to the adoption of Senate Joint Resolution No. 12 of the Fifty-third General Assembly. Sen. Joint Res. No. 12, 1981 Colo.Sess.Laws 2066. In his answer, the Governor argued that the transfers were authorized by article III of the Colorado Constitution and by sections 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S.

(1982).[8] The Governor, who was the sole defendant in this action, asked for a declaratory judgment that the transfers were authorized.

On June 16, 1982, Civil Action No. 82CV5005 was commenced by the General Assembly against the Governor, the Treasurer of the State of Colorado, the Controller of the State of Colorado, the Executive Director of the Department of Administration of the State of Colorado and two pri-

4. have been expended if encumbered as provided by law or as prescribed by the controller. This section was subsequently amended. *See* ch. 286, sec. 2, 1981 Colo.Sess.Laws 1162, 1162–63 (codified at § 24–75–102, 10 C.R.S. (1982)). The amendments expressly recognize that funds may be encumbered and that such funds do not revert. The amendments further specify that moneys unexpended or unencumbered "from the appropriation *to each department* for any fiscal year shall revert...." *Id.* (new language emphasized).

The amended version of § 24–75–102 was in effect when the transfers challenged in Civil Action 82CV5005 occurred.

4. At the time this case was filed, section 24–75–201.1, 10 C.R.S. (1982), provided:

**Restriction on state spending.** For the fiscal year 1978–79 and each fiscal year thereafter, state general fund spending shall be limited to seven percent over the previous year. Any amount of general fund revenues in excess of seven percent, and after retention of unrestricted general fund year-end balances of no less than four percent of the amount appropriated for expenditure from the general fund for the current fiscal year, shall be placed in a special reserve fund to be utilized for tax relief and for construction, maintenance, and repair of highways, and for water projects, and for only the fiscal year beginning July 1, 1980, for administration of highways.

This section was subsequently amended. *See* § 24–75–201.1, 10 C.R.S. (1984 Supp.).

5. Section 24–75–201.2, 10 C.R.S. (1982), provides:

**Restriction on state spending—unrestricted general fund year-end balances.** (1)(a) For purposes of determining unrestricted general fund year-end balances as required in section 24–75–201.1 at the end of any fiscal year, moneys budgeted or allocated for possible state liability, pending the determination of a legal action, and moneys invested in or spent on inventories shall not be included.

(b) Moneys budgeted or allocated for possible state liability, pending determination of a legal action, may be utilized for such purpose without regard to the restrictions on and re-

quirements for expenditures established in section 24–75–201.1.

(2) For purposes of determining the unrestricted general fund year-end balances as required in section 24–75–201.1, the year-end balance of the federal revenue sharing trust fund and all moneys received from the general and special revenue programs of the federal government shall be included in said balances.

6. Section 24–75–302, 10 C.R.S. (1982), provides:

**Capital construction fund.** There is hereby created the capital construction fund to which shall be allocated such revenues as the general assembly may from time to time determine. All unappropriated balances in said fund at the close of any fiscal year shall remain therein and not revert to the general fund. Anticipation warrants may be issued against the revenues of the fund as provided by law.

7. At the time this case was filed, section 24–75–303, 10 C.R.S. (1982), provided:

**Appropriation for capital construction.** The general assembly shall appropriate for capital construction in such form, in such amounts, and from such funds as it deems necessary and may appropriate either for construction or for planning of any project.

This section was subsequently amended. *See* § 24–75–303, 10 C.R.S. (1984 Supp.).

8. The two statutes upon which the Governor relies state as follows:

The powers and duties of the division and of the controller shall be:

. . . .

(b) To recommend transfers between appropriations under the provisions of law, to become effective upon approval by the governor....

§ 24–30–201(1)(b), 10 C.R.S. (1982);

**Responsibilities of the division of budgeting.** (1) The division of budgeting shall assist the governor in his responsibilities pertaining to the executive budget. Specifically, it shall:

. . . .

(k) Review for the governor all transfers between appropriations and all work programs recommended by the controller....

*Id.* § 24–37–405(1)(k).

vate parties.[9] This action challenged certain transactions which occurred in November 1981 and May 1982.

On October 26, 1981, the State of Colorado received the sum of $306,783 from Standard Oil Company of California (Chevron), a private corporation. This sum represented Colorado's share of a special fund created pursuant to a consent order which terminated Chevron's involvement in federal administrative and judicial proceedings arising from allegations by the United States Department of Energy that Chevron had violated federal price-control legislation in sales of petroleum and natural gas products. In response to a letter from Chevron to the State Office of Energy Conservation, an office of the executive branch, indicating that Colorado was required by the consent order to indicate the purpose for which its share would be spent, the Governor had determined that the sum should be allocated to that office for energy conservation purposes. Accordingly, on November 12, 1981, the sum of $306,783 was allotted to the account of the Office of Energy Conservation.

In May of 1982, the Governor approved four sets of transfers of appropriated funds and cash funds spending authorities among several executive departments.[10]

The first transaction involved the transfer of $649,000 of appropriated funds from fifty-two accounts in various executive departments to an account in the Office of the State Controller and a re-allocation of this sum to three different accounts. The Central Pots account[11] of the Office of State Planning and Budgeting (O.S.P.B.) received $627,879, which sum was allocated by O.S.P.B. to several executive departments for personnel expenses. The second transaction involved the transfer of $300,-000 in appropriated funds from Central Pots accounts and line item accounts of seven executive departments to the general funds account of the Governor's Office, which funds were ultimately expended for operations of the Executive Office, the Executive Residence and the Office of the Lieutenant Governor. The third transaction involved the transfer of $312,315 of the cash funds spending authority appropriated to O.S.P.B. for Central Pots to accounts of three executive departments. Finally, $1,179,000 of the cash funds spending authority appropriated to Correctional Industries was transferred to the personal services budgets of other agencies which were cash funded in part and which had generated cash revenues in excess of their appropriated cash funds spending authorities.

**9.** All claims against these private parties, sureties on certain statutorily required bonds for public officials of Colorado, were resolved prior to trial.

**10.** Most legislative appropriations consist of allocations of general fund sums derived from tax revenues; these monies are termed "appropriated funds." Many executive branch programs are funded in whole or in part by income from the sale of goods or services, such as state licenses. These revenues constitute "cash funds" to the agency and department that collect such moneys. The General Assembly exercises its appropriation authority over these non-tax sources of revenue by establishing the cash funds spending authority for such programs. A department may not expend more money in a fiscal year than the limit established by the cash funds spending authority appropriated for the department for that fiscal year. A department which accumulates cash funds in excess of its appropriated cash funds spending authority may retain the excess cash funds for use during the succeeding fiscal year, and must report the excess to the General Assembly. Such a depart-

ment would reasonably anticipate a reduction in its appropriated funds for the ensuing fiscal year, as the excess cash funds would be available to meet some of the subsequent year's expenses. The May 1982 transfers involved in part surplus cash funds spending authorities of various executive departments.

**11.** The term "Central Pots" is a term of art describing a particular funding mechanism adopted by the General Assembly. Expenses for personnel employed by the various branches of government include items which may vary dramatically during any fiscal year. To deal with this problem of anticipated but undeterminable personnel expenses—a multi-million dollar budgeting problem—the General Assembly makes a major appropriation from the general fund into what is denominated the Central Pots fund. Such items as severance pay, insurance premiums, and anniversary and wage survey salary increases are included in Central Pots appropriations.

The complaint in Civil Action No. 82CV5005 alleged that the 1981 and 1982 transactions violated the following provisions of the Colorado Constitution: article III; article IV, section 2; and article V, sections 17, 32 and 33.[12] The complaint also alleged that the transactions violated sections 24–75–102, 24–30–202 and 24–50–110(1)(c), 10 C.R.S. (1982), and certain administrative regulations.[13]

The defendants filed an answer and two counterclaims to this complaint. The answer asserted that all of the challenged transfers were authorized by the Colorado Constitution and by sections 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982). It also asserted that the Chevron funds received by the executive branch in October of 1981 were not subject to legislative appropriation. The first counterclaim alleged that the passage of House Bill 1261 [14] in 1982, a supplemental appropriations bill for the Department of Administration, violated the separation of powers provision of article III of the Colorado Constitution and constituted legislative interference with the executive power to administer appropriated funds, as vested by section 2 of article IV of the Colorado Constitution, because it retroactively decreased Central Pots appropriations for the executive branch for that fiscal year. The second counterclaim alleged that the General Assembly had arbitrarily refused to appropriate sufficient funds to ensure minimal levels of operation for the Office of the Governor for fiscal year 1981–82. It also alleged that such under-funding was part of a continuing course of conduct designed to reduce the effectiveness of the executive branch of government, in violation of article III of the Colorado Constitution.

The trial court concluded that the Governor's treatment of the Chevron funds was authorized because those funds in essence constituted a gift to the State of Colorado and were not subject to the appropriation power of the General Assembly. With respect to the transfers to the Department of Corrections in 1980 and all of the transfers in May 1982, the trial court concluded that they were authorized by sections 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982), but that those statutes violated constitutional provisions vesting the General Assembly with sole authority over appro-

---

**12.** Article III and sections 32 and 33 of article V of the Colorado Constitution are set out in note 2, *supra.* The two other provisions cited in the complaint state as follows:

> **Governor supreme executive.** The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.

Colo. Const. art. IV, § 2.

> **No law passed but by bill—amendments.** No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose.

*Id.* art. V, § 17.

**13.** At the time this complaint was filed, § 24–75–102, 10 C.R.S. (1982), provided as follows:

> **Appropriations expended, when—balance.** Except as otherwise provided by law, all moneys appropriated by the general assembly may be expended or encumbered, if authorized by the controller, only in the fiscal year for which appropriated, and any moneys unexpended or not encumbered from the appropriation to each department for any fiscal year shall revert to the general fund or, if made from a special fund, to such special fund.

Determination of such expenditures or encumbrances shall be made no later than forty-five days after the close of the fiscal year and pursuant to the provisions of section 24–30–202(11).

The pertinent subsection of § 24–30–202, 10 C.R.S. (1982), provides in part:

> (5)(a) No money of the state or for which the state is responsible shall be withdrawn from the treasury or otherwise disbursed for any purpose except to pay obligations under expenditures authorized by appropriation and allotment and not in excess of the amount so authorized.

Section 24–50–110(1)(c), 10 C.R.S. (1982), provides as follows:

> No funds appropriated to any principal department for purposes other than personal services shall be used for personal services; except that the head of a principal department may use such funds for temporary personal services upon a showing of emergency or unusual circumstances where such use is necessary to the proper functioning of the department. Each such use shall be approved in advance by the governor and shall be reported to the general assembly.

**14.** Ch. 2, sec. 2, 1982 Colo.Sess.Laws 96, 97–98.

priations. Reasoning that the expenditure of such funds constituted in effect a reappropriation by executive order, the trial court concluded that the two statutes constituted "an unlawful delegation of the legislative function." Given this resolution, the trial court deemed the question of whether the transfers violated other statutes to be moot. The trial court also dismissed the counterclaims in Civil Action No. 82CV5005 on the grounds that appropriations are always subject to modification and amendment and that the Governor failed to establish that the challenged conduct "did or would impair the functions of the executive branch."

## II. *Jurisdiction*

The Governor contends that the judicial branch lacks jurisdiction to determine the issues raised by these two civil actions. We disagree.

 The Governor initially argues that these lawsuits were not validly authorized because they were instituted pursuant to joint resolutions not subject to the Governor's signature or veto and, therefore, are prohibited by article V, section 39, of the Colorado Constitution. That section of the constitution provides as follows:

> Every order, resolution or vote to which the concurrence of both houses may be necessary, except on the question of adjournment, or relating solely to the transaction of business of the two houses, shall be presented to the governor, and before it shall take effect, be approved by him, or being disapproved, shall be re-passed by two-thirds of both houses, according to the rules and limitations prescribed in case of a bill.

Colo. Const. art. V, § 39. The provision requires presentment to the Governor only of enactments which are legislative in nature. *Watrous v. Golden Chamber of Commerce*, 121 Colo. 521, 218 P.2d 498

(1950). It prohibits the General Assembly from creating laws regulating norms of public conduct without first presenting such laws for approval or veto to the chief executive of the state. A resolution by a legislative body authorizing litigation on behalf of itself cannot be deemed legislation, and is not legislative in nature. *See Sixty-seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972) (per curiam). Therefore, the argument that these lawsuits were not properly authorized because they were not submitted to the Governor for approval or veto is not persuasive.

The Governor also contends that the General Assembly lacks standing to assert the unconstitutionality of statutes it has enacted and which it may repeal.[15] It must be noted that the General Assembly has raised the issue of the unconstitutionality of sections 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982), only by way of response to a particular construction of those statutes asserted by the Governor in the latter's answers to the complaints. The issue is not raised by the complaints filed by the General Assembly and will arise only if this court adopts the statutory constructions urged by the Governor. Because we reject those constructions and reverse the trial court's conclusion that the statutes are unconstitutional, *see* part III, *infra*, we need not decide in what circumstances, if any, the General Assembly may obtain a judicial declaration that a statute which the General Assembly may repeal at any time is unconstitutional.

 Implicit in the Governor's argument that the trial court lacked jurisdiction over these two cases is the suggestion that the General Assembly lacked standing to initiate these lawsuits. Whether a particular plaintiff has standing to invoke the

---

**15.** Of course, there may be circumstances in a civil case requiring dismissal of an asserted theory or defense on grounds of lack of standing. *See, e.g., Harrington v. Bush*, 553 F.2d 190 (D.C. Cir.1977); *Colorado Department of Social Services v. Board of County Commissioners*, 697 P.2d 1 (Colo.1985) (Board could not assert un-

constitutionality of statute in defense because subdivisions of state lack standing to assert such issues against the state); *State Board for Community Colleges & Occupational Education v. Olson*, 687 P.2d 429 (Colo.1984) (examining first party and third party standing claims separately). Such circumstances are not present here.

jurisdiction of the courts is a preliminary inquiry designed to ensure that the judicial power is exercised only in the context of a case or controversy. *See State Board for Community Colleges & Occupational Education v. Olson,* 687 P.2d 429 (Colo.1984). The resolution of standing issues requires a court to determine, based primarily upon the allegations contained in the complaint, "(1) whether the plaintiff was injured in fact [and] (2) whether the injury was to a legally protected right." *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). Parties seeking declaratory or injunctive relief, as in this case, may satisfy the injury-in-fact test by showing that the action complained of has caused or has threatened to cause injury. *Id.; see Community Tele-Communications, Inc. v. Heather Corp.,* 677 P.2d 330 (Colo.1984); *CF & I Steel Corp. v. Colorado Air Pollution Control Commission,* 199 Colo. 270, 610 P.2d 85 (1980). The requirement of an injury in fact is of constitutional dimension; the judicial power granted to courts by article VI of the Colorado Constitution may be exercised only if an actual controversy exists, as demonstrated by real injury. *See Conrad v. City & County of Denver,* 656 P.2d 662 (Colo.1983) (as modified on denial of rehearing). The requirement that the injury be to a legally protected right reflects prudential considerations of judicial self-restraint. *Id.*

In determining whether a plaintiff has asserted a sufficient injury to satisfy the test of standing, the court must accept the averments of the complaint as true and may consider other evidence supportive of standing. *Olson,* 687 P.2d 429. If the complaint fails to allege injury, the case must be dismissed; if the plaintiff does allege sufficient injury, the question of whether the plaintiff is protected by law from the alleged injury must be answered. *Id.* We have stated that the determination of this latter question is "inextricably tied" to the merits of the dispute. *Wimberly,* 194 Colo. at 168, 570 P.2d at 539. A decision that a plaintiff lacks standing because the claimed injury does not infringe any legally protected right of the plaintiff may

be viewed as equivalent to a holding that the plaintiff has failed to state a claim upon which relief may be granted. *Olson,* 687 P.2d 429.

The question of when a legislative body may obtain judicial relief has not arisen frequently, although the existence of judicially cognizable injuries to a legislative body as a whole has been recognized. *See Sixty-seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972); *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); *Thirteenth Guam Legislature v. Bordallo,* 588 F.2d 265 (9th Cir.1978); *Government of Virgin Islands v. Eleventh Legislature of Virgin Islands,* 536 F.2d 34 (3d Cir. 1976); *cf. United States v. American Telephone & Telegraph Co.,* 551 F.2d 384 (D.C. Cir.1976) (dicta); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974) (senator's standing to challenge constitutionality of pocket veto derived in part from injury to Congress); *Legislature of California v. Deukmejian,* 34 Cal.3d 658, 194 Cal.Rptr. 781, 669 P.2d 17 (1983); Note, *Congressional Access to the Federal Courts,* 90 Harv.L.Rev. 1632 (1977). The General Assembly alleges that the challenged transfers impermissibly infringed its power of appropriation in violation of article III (separation of powers) and sections 17, 32 and 33 of article V (appropriations power) of the Colorado Constitution and various statutory provisions. These averments satisfy the requirements of an allegation that an injury in fact has occurred to a legally protected right. *See Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979).

### III. *The "Transfer" Statutes*

The Governor asserts that the trial court erred in concluding that sections 24–37–405(1)(k) and 24–30–201(1)(b), 10 C.R.S. (1982), violate the provisions of article III of the Colorado Constitution prohibiting each branch of government from exercising any power properly belonging to either of

the other two branches of government.[16] We agree.

■ Section 24–37–405(1)(k) states as follows:

(1) The division of budgeting shall assist the governor in his responsibilities pertaining to the executive budget. Specifically, it shall:

. . . .

(k) Review for the governor all transfers between appropriations and all work programs recommended by the controller. . . .

By its terms, this statute defines an administrative review function to be performed by the division of budgeting. It does not confer any authority upon that office to make, recommend or approve any transfers of any kind, nor does it contain any language indicating whether particular transfers are to be presumed authorized. The statute does not confer any power of appropriation or any other legislative power upon the division, and does not violate article III of the Colorado Constitution.

■ Section 24–30–201(1)(b), which will at times be referred to as the "controller statute," states as follows:

(1) The division of accounts and control shall be a division in the department of administration. The controller shall be the head of the division and shall be appointed by the executive director of the department of administration, subject to the provisions of section 13 of article XII of the state constitution. The controller shall be bonded in such amount as said executive director shall fix. The powers and duties of the division and of the controller shall be:

. . . .

(b) To recommend transfers between appropriations under the provisions of law,

to become effective upon approval by the governor. . . .

The authority described in this statute has been vested in the executive branch since the adoption of the Administrative Code of 1941. *See* ch. 2, sec. 9, 1941 Colo.Sess. Laws 35, 54 (codified at C.R.S.1953, § 3–3–1(9)).[17] This statutory language permits the controller to exercise the power of recommendation only with regard to transfers "under the provisions of law." Thus, the statute by its terms limits the controller's authority to recommend transfers to such transfers as are authorized by some source independent of section 24–30–201(1)(b). Certainly transfers prohibited by the Colorado Constitution could not be considered transfers "under the provisions of law."

[12] The Governor contends that the phrase "under the provisions of law" should be construed to modify the word "appropriations." Such a construction would render the phrase meaningless; "appropriations" may only be made by the adoption of a statute and, therefore, are always made "under the provisions of law." When possible, every word of a statute must be given effect. *See Leonard v. Board of Directors*, 673 P.2d 1019 (Colo. App.1983). Furthermore, if the transfers subject to the recommending authority of the controller are not limited to transfers authorized by some source independent of the controller statute, there would be no limit on the authority of the Governor to approve transfers of funds between appropriations, even in violation of specific directions by the General Assembly in the Long Bill or in some other statute. To read such broad authority into the statute would acknowledge that by this statute the General Assembly delegated to the chief executive the power of appropriation—an unconstitutional result to be avoided rather than embraced in seeking to ascertain the meaning and intent of legislation. *See, e.g., Romero v. Sandoval*, 685 P.2d 772 (Colo.1984).

---

**16.** For text of article III, see note 2, *supra.*

**17.** The power was initially vested in the Division of Budgets. Ch. 2, sec. 12, 1941 Colo.Sess.Laws

54. In 1947, it was transferred to a newly created Division of Accounts and Control. Ch. 118, sec. 2, 1947 Colo.Sess.Laws 221.

A limited construction of the controller statute is further indicated when consideration is given to another principle of statutory construction, namely, that when determining the meaning of a particular statute, it is important to consider the relationship of that statute to other legislative provisions concerning the same subject matter when the statute in question is part of a comprehensive legislative program. *See, e.g., Allen v. Charnes,* 674 P.2d 378 (Colo.1984). The controller statute was initially adopted in 1941 as part of a comprehensive legislative revision of statutory provisions governing the administrative operations of the executive branch of government. *See* ch. 2, 1941 Colo.Sess.Laws 35. The conclusion that the controller statute refers only to transfers otherwise authorized by law is supported by an examination of the history of certain other provisions of the Code.

When the predecessor of the controller statute was adopted in the 1941 Administrative Code, a separate provision of that Code dealt with the authority of the Governor to effect transfers of funds appropriated to executive departments. Section 11 of article 2 of the 1941 Code—the section immediately preceding the predecessor of the controller statute—expressly authorized the Governor "to transfer from the contingent and incidental fund of any department, board or bureau having a surplus therein to any department, board or bureau having a deficit in its contingent and incidental fund such sums as he may deem necessary." Ch. 2, sec. 11, 1941 Colo.Sess. Laws 35, 52 (codified at C.R.S.1953, § 3–2–3).

However, the provision authorizing transfers between contingent and incidental funds of departments was repealed in 1963. Ch. 32, sec. 3, 1963 Colo.Sess.Laws 120, 122. Prior to 1963, it could be argued that the authority of the controller and of the Governor referred to in the controller statute extended at least to interdepartmental transfers of appropriations for contingent and incidental funds. However, since the repeal of the statute giving the Governor authority to transfer contingent and incidental funds from one department to another, the only statutory authority of the controller or the Governor with respect to the transfer of appropriated funds found in the Administrative Code, with the exception of an emergency provision,[18] is the language of the controller statute referring to transfers authorized by law. The Governor's contention that since 1941 the controller statute itself has by implication recognized an authority in the office of the Governor to transfer funds between departments, if adopted, requires the conclusion that statutory language which for twenty-two years purported to authorize interdepartmental transfers of contingent and inci-

---

**18.** At the time this litigation arose, § 28–2–106(4), 11 C.R.S. (1982), of the Colorado Disaster Emergency Act of 1973 also referred to the transfer of appropriated funds. This statute provided the Governor with the following power to fund state disaster emergency aid: "If moneys available from the [disaster emergency] fund are insufficient, the governor, with the concurrence of the [disaster emergency] council, may transfer and expend moneys appropriated for other purposes." The Act, with identical language concerning the Governor's authority to transfer funds, has been recodified at §§ 24–33.5–701 to –715, 10 C.R.S. (1984 Supp.).

It is also noteworthy that § 24–30–206(3), 10 C.R.S. (1982), also contains language dealing with the authority of the controller and of the Governor with respect to appropriations made by the General Assembly. This statute confirms the authority of the controller, with the approval of the Governor, "[i]n order to provide some degree of flexibility to meet emergencies arising during each fiscal year in the expenditures for operation and maintenance of the various departments ... of the state government," to require department heads to create a reserve from sums appropriated or other funds available to the department. *Id.* Upon the Governor's approval, sums from this reserve may be "returned to the appropriation or other fund to which it belongs" at any time during the fiscal year, and "unexpended and unencumbered balances of allotments at the end of each quarter shall be credited to the reserve set up for the fiscal year." *Id.* Identical language appears in the 1941 Code. Ch. 2, sec. 17, 1941 Colo.Sess. Laws 35, 56–57. The section does not purport to authorize interdepartmental transfers of appropriations; it does, however, represent another example of independent legislative treatment of the authority of the Governor to deal with appropriations.

dental funds in fact was mere surplusage. We reject this proposed construction. *See People v. Hamilton,* 666 P.2d 152 (Colo. 1983). Rather, we conclude that the controller statute refers only to transfers which are authorized by some other provision of law. Thus construed, the statute itself does not unconstitutionally delegate to the chief executive the power of the General Assembly to appropriate funds.

### IV. *Inherent Executive Authority*

The Governor contends that the 1980 and 1982 transfers were within the discretion inherent in the constitutional authority of the chief executive to administer the executive branch of government. We disagree.

In *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978), we recognized that inherent in the responsibility for administering the executive branch of government granted to the Governor by article IV, section 2, of the Colorado Constitution, is the authority to control "how the money is to be allocated." *Id.* at 445, 579 P.2d at 626. This flexibility in executive authority is limited, however, by the principle that the constitution vests the General Assembly with authority to determine "the *amount* of *state funds* " to be spent for particular purposes. *Id.* (emphasis in original). The tension created by these contrasting principles is inherent in our tripartite form of government. To the extent the executive and legislative branches seek to accommodate diverse fundamental policy goals pursued by each branch, the tension will be minimized. To the extent there are major impediments, from whatever origin, to such accommodation, the tension will increase. With the political theory of Montesquieu and the practical models of federal and other state constitutions as guides, the citizens of this state have concluded that the tension is essential to guarantee the maximum realization of their fundamental policy aspirations. *See Pena v. District Court,* 681 P.2d 953 (Colo.1984). When confronted by the necessity of exploring this twilight zone of competing constitutional authority, courts must measure the extent of the Governor's authority to administer by the extent of the General Assembly's power to appropriate. *See Anderson,* 195 Colo. 437, 579 P.2d 620; *MacManus v. Love,* 179 Colo. 218, 499 P.2d 609 (1972).

With certain minor exceptions, the challenged transactions involved the transfer of appropriations or cash funds spending authorities from the department initially designated to receive such appropriations or authorities to another department. The Governor concedes that the transfers in question, if not authorized by the controller statute, were not specifically authorized by any other statute.[19]

It is undisputed that the power to legislate granted to the General Assembly by article V, section 1 of the Colorado Constitution permits the General Assembly to define the operation of grants of governmental authority articulated by the constitution, *cf. Walker v. Bedford,* 93 Colo. 400, 26 P.2d 1051 (1933), and that the power of the General Assembly over appropriations is absolute. *MacManus,* 179 Colo. 218, 499 P.2d 609; *In re Continuing Appropriations,* 18 Colo. 192, 32 P. 272 (1893). In *People ex rel. Hegwer v. Goodykoontz,* 22 Colo. 507, 511, 45 P. 414, 416 (1896), this court commented as follows on this allocation of governmental authority:

**19.** The General Assembly urges that the challenged transfers violated one or more of the following statutes: § 24-30-202(5)(a), 10 C.R.S. (1982) (prohibiting disbursement of state funds for purposes other than "obligations under expenditures authorized by appropriation and allotment and not in excess of the amount so authorized"); § 24-50-110(1)(c), 10 C.R.S. (1982) (prohibiting the use of monies appropriated for non-personal services expenses to pay for personal services expenses); § 24-75-102, 10 C.R.S. (1982) (requiring unexpended and unencumbered appropriations to "revert to the general fund or, if made from a special fund, to such special fund"); and §§ 24-75-302 and -303, 10 C.R.S. (1982) (authorizing the General Assembly to appropriate funds for purposes of capital construction). These issues were not addressed by the trial court. Because we conclude that the particular transfers in question were not authorized by statute and were not within the Governor's inherent constitutional authority, we need not construe these statutes in this case.

The object of the constitutional provision inhibiting the payment of money from the state treasury, except by an appropriation made by law, etc., is to prohibit expenditures of the public funds at the mere will and caprice of the crown or those having the funds in custody, without direct legislative sanction therefor. . . .

*See also State, ex rel. Norfolk Beet-Sugar Co. v. Moore,* 50 Neb. 88, 69 N.W. 373 (1896) (discussing history of appropriations power in British and American governments). This plenary power of the legislature over appropriations is the power " 'to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other.' " *People ex rel. Ammons v. Kenehan,* 55 Colo. 589, 598, 136 P. 1033, 1036 (1913) (quoting *Moore,* 50 Neb. at 96, 69 N.W. at 376).

In determining whether particular legislation constitutes an appropriation, we have observed that no precise formula is required, and that the critical determination is whether the particular law fixes a sum certain for a specific purpose. *See Goodykoontz,* 22 Colo. 507, 45 P. 414. An act creating the office of state steam boiler inspector and fixing the inspector's annual salary was held to constitute an appropriation. *Id.; see also In re Continuing Appropriations,* 18 Colo. 192, 32 P. 272 (upholding the general validity of continuing appropriations). Conversely, a statute fixing a rate of pay for soldiers serving under order of local authorities in times of insurrection was held not to constitute an appropriation because no limit was set on the total that might be expended for such pay. *Kenehan,* 55 Colo. 589, 136 P. 1033.

Recognizing the legislature's plenary power to determine the objects and level of support to which the public revenues may be put does not mean that the executive branch has no role in the appropriations process. The governor has veto power over appropriations. Colo. Const. art. IV, §§ 11, 12; *see In re Interrogatories of Governor Regarding Certain Bills of the Fifty-first General Assembly,* 195 Colo. 198, 578 P.2d 200 (1978). The executive branch also plays an important role in the budget process by submitting information to the General Assembly necessary for the intelligent exercise of the appropriations power. *See* §§ 24–37–100.3 to –404, 10 C.R.S. (1982 & 1984 Supp.); *Dodge v. Department of Social Services,* 657 P.2d 969 (Colo.App.1982). The Governor also may convene the General Assembly on extraordinary occasions to address fiscal crises. *See* Colo. Const. art. IV, § 9; *e.g.,* Proclamation, 1933 Colo.Sess.Laws, Extraordinary Session. Such cooperation between the branches of government illustrates the exception to the command of article III that the powers of government be kept distinct. *See People v. McKenna,* 199 Colo. 452, 611 P.2d 574 (1980).

■ Once an appropriation has been made, it becomes the executive's responsibility to "take care that the laws be faithfully executed." Colo. Const. art. IV, § 2. The Governor correctly notes that the duty to execute appropriations or spending laws encompasses the authority to administer the budget. *See Anderson,* 195 Colo. 437, 579 P.2d 620; *MacManus,* 179 Colo. 218, 499 P.2d 609. As the trial court found, the transactions here challenged were carried out in the good faith belief that they were essential for the fulfillment of that constitutional responsibility in view of the circumstances confronting the executive branch. The issue, however, is whether such transactions were in fact constitutionally authorized.

■ The appropriations and cash funds spending authorities transferred by the Governor in 1980 and 1982 were initially designated by the General Assembly for the use of particular executive departments. Each executive department is responsible for a particular area of governmental concern, as defined by the statute creating the department. When the General Assembly determines the amount of appropriations or cash funds spending author-

ity to be used by a particular executive department, it is clear that one object of that legislative decision is regulation of the activity level of that department. The transfers challenged here altered dramatically the objectives which the General Assembly had determined were to be achieved through use of state monies. We conclude that whatever inherent authority to administer the executive budget may exist in the office of the chief executive, such authority may not normally be invoked to contradict major legislative budgeting determinations. In our view, the initial appropriations to the departments involved here constituted such major legislative budgetary determinations.

The Governor contends that he shares the responsibility with the General Assembly to assure that appropriations and expenditures within a fiscal year do not exceed the total taxes in that year under article X, section 16, of the Colorado Constitution, and that the executive transfers here challenged were consistent with that authority. However, this constitutional provision applies by its terms to appropriations made and expenditures authorized "by the general assembly." Colo. Const. art. X, § 16. The case of *In re Priority of Legislative Appropriations*, 19 Colo. 58, 34 P. 277 (1893), the only authority cited by the Governor in support of this argument, merely recognizes that when revenues are insufficient to satisfy appropriations, a pronouncement on the priority of claims against the auditor may not be resolved in an *ex parte* proceeding without the claimants. That case does not support the broad interpretation of this constitutional provision advanced by the Governor.

The Governor relies on the following decisions from four other jurisdictions in support of the assertion that these transfers should be considered authorized by the inherent executive authority granted to the chief executive by the Colorado Constitution: *State, ex rel. Schneider v. Bennett*, 219 Kan. 285, 547 P.2d 786 (1976) (*Schneider I*) and 222 Kan. 11, 564 P.2d 1281 (1977) (*Schneider II*); *Bussie v. McKeithen*, 259 So.2d 345 (La.App.1971), *writ refused by*, 261 La. 451, 259 So.2d 910 (1972); *Advisory*

*Opinion in re Separation of Powers*, 305 N.C. 767, 295 S.E.2d 589 (1982); and *State, ex rel. Meshel v. Keip*, 66 Ohio St.2d 379, 423 N.E.2d 60 (1981). Analysis of these decisions reveals that they were decided in quite different factual and legal contexts and do not assist the delicate delineations of governmental authority raised by these transactions under the Colorado Constitution.

In *Schneider I*, the Supreme Court of Kansas held that an executive agency's authority to make transfers between line items of its appropriation constituted an exclusively executive power which could not be delegated to a legislative committee. *See* Kan.Stat.Ann. § 75–3726a (Supp.1975). The court distinguished, however, between the power of an agency to administer its own appropriation and the power of an administrative body to authorize an agency to exceed its appropriation, and concluded that in the latter case the delegation would infringe the legislative authority over appropriations. *Schneider I*, 219 Kan. 285, 547 P.2d 786. Indeed, *Schneider I* recognized that transfers which would cause amounts expended to exceed appropriations would encroach on the legislative domain, a conclusion which in reality supports the argument of the General Assembly here that the 1980 and 1982 executive transfers impermissibly altered the legislative policies established by the General Assembly for the departments involved. *Schneider II* dealt with particular aspects of the response of the Kansas legislature to *Schneider I*, and construed a certain provision of the Kansas Constitution which has no counterpart in the Colorado Constitution.

In *Advisory Opinion in re Separation of Powers*, the North Carolina Supreme Court concluded that its state legislature could not limit the authority of executive budget officials to transfer funds between line items "in the department of any agency" to ten percent of the amounts appropriated. *See* 305 N.C. 767, 295 S.E.2d 589 (construing ch. 1127, sec. 82, 1981 N.C. Sess.Laws 1622, 1654, a proposed amend-

ment to N.C.Gen.Stat. § 143–23 (1983)). In *Bussie v. McKeithen,* the Louisiana Court of Appeals held only that a line item within an appropriation to a particular agency may be transferred by the agency without infringing on the legislative appropriation power. *See* 259 So.2d 345. Finally, in *State, ex rel. Meshel v. Keip,* the Ohio Supreme Court considered whether the Ohio legislature may delegate to a board the power to authorize transfers of "all or part of appropriations from one fiscal year to another." *See* Ohio Rev.Code Ann. § 127.14 (Page 1984). The court held that such a delegation was permissible only because another statute required such transfers to conform to the intent of the Ohio General Assembly. *See Keip,* 66 Ohio St.2d 379, 423 N.E.2d 60 (construing Ohio Rev.Code Ann. § 127.14(B) (Page 1984)). These decisions, dealing with *intra*departmental transfers in the context of various statutory and constitutional clauses, are of limited assistance in view of the circumstances of this case.

The General Assembly relies on decisions from courts in other jurisdictions which describe the legislative appropriation power as the power to determine the precise amount to be spent on a particular object deemed worthy of state support by the legislature. *See, e.g., State ex rel. Kurz v. Lee,* 121 Fla. 360, 163 So. 859 (1935); *Colbert v. State,* 86 Miss. 769, 39 So. 65 (1905). These decisions are in basic harmony with our early pronouncements in *Kenehan,* 55 Colo. 589, 136 P. 1033, and *Goodykoontz,* 22 Colo. 507, 45 P. 414. The General Assembly also refers to opinions in other jurisdictions finding certain executive transfers unauthorized on state statutory or constitutional grounds. *See Wallace v. Baker,* 336 So.2d 156 (Ala.1976); *County of Cook v. Ogilvie,* 50 Ill.2d 379, 280 N.E.2d 224 (1972); *Opinion of the Justices to the Sen-*

*ate,* 375 Mass. 827, 376 N.E.2d 1217 (1978); *Baker v. Commonwealth,* 312 Mass. 490, 45 N.E.2d 470 (1942). Although different constitutional clauses, in different factual circumstances are involved in these cases, they support our conclusion that the legislative power of appropriation was impermissibly contravened by the major transfers challenged in this case.[20]

Article V, section 33, of the Colorado Constitution states as follows:

No moneys in the state treasury shall be disbursed therefrom by the treasurer except upon appropriations made by law, or otherwise authorized by law, and any amount disbursed shall be substantiated by vouchers signed and approved in the manner prescribed by law.

The Governor contends that the phrase "or otherwise authorized by law," added to section 33 in 1974, *see* Sen.Con.Res. No. 1, sec. 1, 1974 Colo.Sess.Laws 445, 450, contemplates a delegation of fiscal authority to the executive branch that encompasses the power to transfer monies between appropriations. This interpretation, if adopted and applied to the transfers here, would in effect authorize the chief executive to reappropriate funds in a manner which would directly contravene major objectives or purposes sought to be achieved by the General Assembly's process of appropriation. We do not read so broad a grant of executive authority into this phrase.

▪ We conclude that the transfers between executive departments here undertaken impermissibly infringed upon the General Assembly's plenary power of appropriation, and, therefore, cannot be deemed to fall within the inherent administrative authority of the Governor over the state budget. However accurate the perception of the executive branch that emergency conditions existed might have been,

---

**20.** The May 1982 transfer of $649,000 from fifty-two accounts to a single account in the O.S.P.B. appears to include what ultimately can be characterized as a transfer of funds from one account to another account within a single department. For example, as a result of the transfers here involved, the Department of Personnel experienced a reduction of $9,742 in its capital outlay account and an increase of $16,937 in its legal services account. The parties have framed the issues in terms of relatively large interdepartmental transfers. Therefore, we neither decide nor imply by this opinion that an intradepartmental executive transfer of $10,000 from one account to another is barred absolutely by separation of powers principles.

the means ultimately chosen in good faith to remedy those conditions were not within the inherent authority of the chief executive.[21]

## V. *The Counterclaims*

The Governor asserts that the trial court erred in dismissing the two counterclaims filed in Civil Action No. 82CV5005. The first counterclaim alleged that the General Assembly, by adopting a supplemental appropriation which in fact reduced the amount of funds available for certain executive expenses, unlawfully invaded the Governor's executive authority to manage the budget. The second counterclaim alleged that the General Assembly engaged in a continuing course of action of arbitrarily refusing to appropriate sufficient sums for the budget of the Governor's executive office, thereby unconstitutionally restricting the Governor from carrying out his powers to administer the executive branch. The trial court ruled, with respect to both counterclaims, that the evidence failed to sustain the Governor's allegations. We agree.

As the trial court noted, the legislative appropriation process consists of three stages in Colorado: preparation by the Joint Budget Committee of an initial budget proposal; passage of the state budget by means of a statute, known as the "Long Bill"; and supplemental appropriations. The executive branch, through the Office of State Planning and Budgeting, prepares estimates of necessary expenses of the executive branch and submits these estimates to the Joint Budget Committee of the General Assembly. Through hearings commencing in December or January, the Joint Budget Committee analyzes the budgetary requests of the executive branch and makes recommendations to the General Assembly concerning the executive budget provisions contained in the Long Bill. When adopted, the Long Bill is subject to approval or veto by the Governor and to those provisions of the constitution authorizing the legislature to override any veto. Although not included in the general statutes, the Long Bill is a portion of the Session Laws of the state and is a statute.

The Long Bill is necessarily based to some degree upon estimates. In the course of a given fiscal year, initial fiscal assumptions underlying final dollar allocations and estimates of minimum levels of service may prove to be inaccurate. Consequently, requests for supplemental appropriations are normally prepared by the executive branch during the fiscal year for presentment to the General Assembly for passage in the last half of the fiscal year. When enacted, these supplemental appropriation bills are statutes, just as the Long Bill is a statute.

The Colorado Constitution precludes deficit fiscal operation. Colo.Const. art. X, § 16. If supplemental appropriations are deemed essential at a time during which the General Assembly is not in regular session, the Governor may convene a special session of the legislature to address the perceived crisis. *See id.* art. IV, § 9. Given the eternal inability of humans to foretell accurately the course of their own future conduct as well as the complexity of

---

**21.** The Governor also asserts that his authority to transfer sums between different departments of the executive branch accords with long-standing administrative interpretation of the transfer statutes. *See, e.g.,* C.C.R. 101–3, § 6.30 (1984); Division of Budgeting, *Policies and Instructions on Transfers,* Budget Circular No. 1 (November 1, 1979); Op.Att'y Gen. No. 68–4237 (August 12, 1968) (construing predecessors of §§ 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982), as authorizing certain interdepartmental transfers). Indeed, after consultation with the Attorney General, the Governor was assured that his course of action was constitutionally permissible. We recognize, as did the trial court, that the Governor acted in good faith based on his perception of the seriousness of the problems facing his office and the state and on the counsel of legal advisors that his acts were lawful. It is true that the construction of statutes adopted by those charged with their administration should be given deference by the courts. *See Colorado Association of Public Employees v. Lamm,* 677 P.2d 1350 (Colo.1984). Here, however, the crucial issues involve the construction of constitutional provisions. Furthermore, as we have now held, the Attorney General's interpretation of executive power does not accord with the constitutional parameters of that power.

governmental operations, the supplemental appropriation process becomes an extremely important facet of legislative responsibility.

The evidence was conflicting as to the exact effect of supplemental appropriations adopted in the spring of 1982 for the Central Pots budget for fiscal year 1981–1982. The trial court found that in fact these supplemental appropriations did not result in a reduction of the total amount of funds available for Central Pots as provided by the Long Bill for that year. The evidence supports the trial court's findings; therefore, we will not disturb them on appeal. *Gebhardt v. Gebhardt*, 198 Colo. 28, 595 P.2d 1048 (1979).

With respect to the second counterclaim, the trial court made the following findings:

(a) There was no evidence that the office of the Governor was underfunded for FY 1981–1982 or that the functions and duties of that office were impaired by the level of appropriation made.

(b) To the contrary, the evidence clearly established beyond a reasonable doubt, that the financial deficit realized by the executive offices of the Governor in April 1982 and thereafter was the product of a knowing overspending beyond the appropriation level established by the legislature—this without unusual or unexpected circumstances intervening.

Although conflicting evidence was introduced by the parties concerning these questions, the record does support the trial court's findings; therefore, we will not disturb them on appeal. In view of these findings, the factual predicate for the Governor's legal argument fails. It is therefore not necessary to address the Governor's position that the General Assembly is required by the constitution to appropriate a minimal level of funding to permit the executive branch to carry out its constitutional functions.

## VI. *The Chevron Funds*

In its cross-appeal, the General Assembly contends that the trial court erred in concluding that the determination of the Governor to direct the expenditure of $306,783 paid by Chevron did not violate the appropriation power of the General Assembly. In the circumstances of this case, we affirm.

The General Assembly does not dispute the principle that the Governor may exercise control over funds received by the state which are "custodial" in nature—funds not generated by tax revenues which are given to the state for particular purposes and of which the state is a custodian or trustee to carry out the purposes for which the sums have been provided. *Pensioners Protective Association v. Davis*, 112 Colo. 535, 150 P.2d 974 (1944). The sum in question was paid by Chevron as the result of a consent order which resolved several federal administrative and judicial proceedings to which Chevron was a party.

The federal proceedings arose after an audit of Chevron's pricing and allocation policies conducted by the United States Department of Energy (DOE) revealed that from January 1, 1973, through January 27, 1981, Chevron may have violated Department of Energy regulations in marketing certain petroleum and natural gas products. The consent order, which was entered in a Department of Energy administrative proceeding instituted by the Department against Chevron, required Chevron to establish a fund of $25,000,000 for the benefit of those states in which the petroleum and natural gas products in question had been marketed. The order permitted eligible states to request proportionate shares of the fund and provided for notice to those states as follows:

Within 15 days after this Consent Order has been executed, [Office of Special Counsel of the DOE] shall notify the eligible states (1) of the amount designated for that state; (2) of the uses to which the amount may be put; and (3) the date by which an appropriate state official must certify that the state will undertake a specific program. A state's entitlement under this [provision] is conditioned upon said certification.

A list of possible uses for which the funds might be used were published in the Federal Register,[22] and in a letter addressed to the Colorado Office of Energy Conservation a Chevron representative described several uses which might be acceptable, including energy conservation or energy research. The amount to be distributed to each eligible state was to be determined by Chevron by means of a formula specified in the consent order. The Department of Energy and Chevron retained ultimate authority to approve any use of the funds proposed by eligible states.

We conclude that the trial court's characterization of the Chevron payment as not subject to the appropriation power of the General Assembly is warranted by the record. The money, whether deemed from a private source because disbursed from the coffers of a private corporation or from a federal source because approved by a federal administrative authority, was required to be used for a purpose approved ultimately by non-Colorado authorities. The funds, although fundamentally in the nature of a reimbursement for moneys illegally taken from Colorado citizens, must be deemed to have originated outside Colorado. While the determination of which specific purpose among several options should be benefited was a determination which would inevitably affect the level of activity of some governmental department, the role of the state in administering the fund, as determined by the external source generating the revenue, was essentially custodial in nature. The fact that a discretionary determination had to be made concerning the object for which those non-Colorado sums would be spent is not the controlling factor in assessing the nature of the fund. We conclude that, under all the circumstances, this fund is most appropriately deemed a trust or custodial fund, to be administered in a trusteeship or custodial capacity. The Governor's exercise of authority over this fund does not, in our view, constitute an impermissible invasion of the General Assembly's right to appropriate public funds. *See MacManus*, 179 Colo. 218, 499 P.2d 609.

For the foregoing reasons, the judgment of the trial court is affirmed insofar as it concludes that the 1980 and 1982 interdepartmental transfers of appropriations and cash funds spending authorities were not authorized, that the Governor properly exercised executive authority over the Chevron fund, and that the Governor failed to satisfy his burden of proof respecting the two counterclaims in Civil Action No. 82CV5005. The trial court's judgment declaring that sections 24–30–201(1)(b) and 24–37–405(1)(k) violate the Colorado Constitution is reversed, and the case is remanded to the trial court for further proceedings.

QUINN, J., dissents in part.

QUINN, Justice, dissenting in part:

I respectfully dissent from that part of the court's opinion holding the budgetary transfers violative of the legislative power of appropriation. As a preliminary matter, I view the General Assembly's challenge to the facial constitutionality of the transfer statutes, §§ 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982), as not presenting a justiciable claim for which a court can grant relief in the form of a judgment declaring the statutes unconstitutional. With respect to the merits of this case, although I agree with the court's holding that the transfer statutes do not unconstitutionally abridge the legislative power of appropriation, I cannot accept the rigid limitations which the court has placed on the Governor's power to make budgetary transfers within the executive department of government. I believe that the proper resolution of the constitutional validity of the Governor's budgetary transfers requires the application of standards different from those employed by the majority. Application of these other standards leads me to conclude that the only appropriate disposition of this case is to reverse that part of the judgment which invalidates the

---

**22.** *See* 46 Fed.Reg. 41,854 (1981).

budgetary transfers and to remand the case to the trial court for a new trial.

## I.

In declaring the transfer statutes unconstitutional, the trial court expressly acknowledged the General Assembly's right to challenge the facial validity of the statutes upon which the Governor relied in making the budgetary transfers in question. Although the majority does not address this aspect of the case, I believe the declaration of unconstitutionality made by the trial court is fundamentally flawed.

Judicial principles of standing are calculated to ensure not only that the party seeking judicial relief has a sufficient legal stake in the outcome of the controversy, L. Tribe, *American Constitutional Law* 79 (1978), but also to guard against the judicial assumption of power that has been constitutionally vested in another department of government. As this court observed in *Conrad v. City and County of Denver*, 656 P.2d 662, 668 (Colo.1982):

> The "injury-in-fact" requirement is dictated by the need to assure that an actual controversy exists so that the matter is a proper one for judicial resolution, for consistent with the separation of powers doctrine embodied in Article III of the Colorado Constitution, "[c]ourts cannot, under the pretense of an actual case, assume powers vested in either the executive or the legislative branches of government." [*Wimberly v. Ettenberg*, 194 Colo. 163, 167, 570 P.2d 535, 538 (1977).] The requirement that the interest injured be of a type legally protected by statutory or constitutional provisions is a prudential rule of standing based on judicial self-restraint.

I have no problem with the General Assembly's right to challenge the validity of the Governor's actions as violative of the separation of powers doctrine, Colo.Const. art. III, or as violative of the transfer statutes themselves, §§ 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982). Deciding whether the actions of the Governor exceeded whatever authority has been committed to the Governor in the matter of budgetary transfers, while itself a delicate exercise in constitutional and statutory interpretation, is nonetheless the responsibility of the judicial department as the ultimate interpreter of the law bearing on an actual controversy. The trial court, however, did not resolve the case on this basis. Instead, the court accepted the claim of the General Assembly that, even if its own statutory law authorizes the Governor to make the budgetary transfers, the statutes themselves are facially unconstitutional as violative of the separation of powers doctrine.

Although the General Assembly's claim of unconstitutionality was raised only as a rejoinder to the Governor's reliance on the transfer statutes as one of the sources of his authority to make the budgetary transfers, it was this claim of facial unconstitutionality that provided the basis of the trial court's judgment. If indeed, as the trial court ruled, the legislative enactments are unconstitutional, the only recourse contemplated under the Colorado Constitution, in my view, is for the General Assembly to remedy the constitutional infirmity by amending or repealing its own enactments. Whether the General Assembly chooses or has the necessary votes to effectuate an amendment to or repeal of the transfer statutes is essentially a nonjusticiable political issue, the resolution of which should be remitted to the interplay of the political process. *See generally Goldwater v. Carter*, 444 U.S. 996, 1002, 100 S.Ct. 533, 536, 62 L.Ed.2d 428 (1979) (plurality opinion); *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *Holtzman v. Schlesinger*, 484 F.2d 1307, 1309–10 (2d Cir.1973), *cert. denied* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

When a court refuses to entertain a request by the General Assembly to declare a legislative enactment unconstitutional, it does no more than place the General Assembly in the position of resorting to the very process which the Colorado Constitution demonstrably and exclusively commits to that body—the process of changing the

statutory law. Colo.Const. art. V, § 1. In short, any injury that arguably might have been suffered by the General Assembly in its official capacity as a result of the claimed unconstitutionality of its own statutes is much too speculative in nature and certainly not the type which our traditional rules of standing are designed to address.

I would hold that when, as here, the General Assembly requests a court to declare legislative enactments unconstitutional, a nonjusticiable issue is presented that does not lend itself to judicial relief. This resolution of the standing issue would dictate that the case be returned to the trial court to resolve the validity of the Governor's budgetary transfers under appropriate standards of constitutional adjudication. Because the majority, however, has resolved the issues relating to the budgetary transfers on a basis different from that relied on by the trial court, I address this latter aspect of the case.

## II.

The court concludes that the transfers involved here impermissibly infringed on the General Assembly's power of appropriation. This conclusion, in my view, proceeds from an unduly restrictive view of the Governor's inherent authority as the state's chief executive officer responsible for the administration and management of the executive branch of government. I accordingly register my dissent to Part IV of the court's opinion.

## A.

Article III of the Colorado Constitution divides the powers of government into three separate, co-equal departments—the legislative, executive, and judicial—and, under the rubric of the separation of powers doctrine, expressly prohibits any "person or collection of persons charged with the exercise of powers properly belonging to one of these departments" from exercising "any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." The supreme executive power of the state is vested in the Governor, who is charged with the responsibility of faithfully executing the laws of this state. Colo.Const. art. IV, § 2. The legislative power of the state is vested in the General Assembly consisting of a senate and house of representatives. Colo.Const. art. V, § 1. This legislative power includes the power to appropriate money "for the expense of the executive, legislative and judicial departments of the state." Colo.Const. art. V, § 32.

While the separation of powers doctrine codified in Article III divides the allocation of power between three separate and co-equal departments of government, it does not expressly prescribe the exact limits of each department's respective powers, nor can it reasonably be expected to do so. The purpose of the separation of powers doctrine is not to create three mutually exclusive, watertight compartments of government, but rather to prevent one department from exercising power that is essential to another department's proper exercise of its constitutionally assigned functions. *Nixon v. Administrator of General Services*, 433 U.S. 425, 442–43, 97 S.Ct. 2777, 2789–90, 53 L.Ed.2d 867 (1977); *see also People v. McKenna*, 196 Colo. 367, 373, 585 P.2d 275, 279 (1978). The constitution, while diffusing the power among three branches of government in order to protect against the tyrannical accumulation of power in one, contemplates that "practice will integrate the dispersed powers into a workable government"; and to this end it enjoins upon the three branches "separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). As one court succinctly observed:

Under our system of government the absolute independence of the departments and the complete separation of powers is impracticable. We must maintain in our political system sufficient flexibility to experiment and to seek new methods of improving governmental efficiency. At the same time we must not

lose sight of the ever-existing danger of unchecked power and the concentration of power in the hands of a single person or group which the separation of powers doctrine was designed to prevent.

*State ex rel. Schneider v. Bennett,* 219 Kan. 285, 288–89, 547 P.2d 786, 791 (1976).

Thus, the phrase "separation of powers," no matter how solemnly reiterated, provides no talismanic solution to issues of unconstitutional usurpation of power by one department of government. Resolution of such issues requires an analysis of the functions delegated to the competing departments with a view toward developing adjudicatory standards that effectively accommodate the constitutional missions granted to each of the competing departments. An indispensable component of that analysis is the concept of implied or inherent power.

The idea that expressly granted constitutional powers carry with them implied or inherent powers necessary to their execution is not novel. As one commentator has noted:

> [A]lthough not conferred expressly by the Constitution, [such powers] are derived from the express powers by reasonable implication. One cannot question the validity, indeed necessity, of drawing reasonable implications from the constitutional text in this area, as in all others, for the implied authority provides the means whereby the express powers are carried into execution.

Winterton, *The Concept of Extra-Constitutional Executive Power in Domestic Affairs,* 7 Hastings Const.L.Q. 1, 9 (1979) (footnotes omitted); *see Marshall v. Gordon,* 243 U.S. 521, 537, 37 S.Ct. 448, 451, 61 L.Ed. 881 (1917) (principle of implied or inherent power—power that is reasonably appropriate and relevant to the exercise of a granted power is to be considered as accompanying the grant—"has been so universally applied that it suffices merely to state it"); *Kolkman v. People,* 89 Colo. 8, 33–34, 300 P. 575, 584–85 (1931) (power to promulgate rules of procedure recognized as inherent in constitutional functions as-

signed to judicial department of government). The principle of inherent power, therefore, is simply a recognition of the fact that the separation of powers doctrine must be understood in a sense that recognizes the multi-faceted nature of governmental power delegated to each department of government by the Colorado Constitution.

The legislative power of appropriation, which consists of setting aside a certain amount of money for a particular purpose, *People v. Kennehan,* 55 Colo. 589, 136 P. 1033 (1913), represents an expression of legislative intent that a particular result, the object of the appropriation, be attained through the expenditure of an amount up to the limit of the appropriation. The amount of the appropriation is based on the General Assembly's projection of the amount necessary to accomplish the governmental mission for which a particular agency of government is responsible. Although the appropriation may represent the general level of activity which the legislature intends the particular agency to engage in, it is at best no more than an estimate and may well be greater than or less than the amount necessary and sufficient to achieve the desired result. An appropriation, therefore, is not to be viewed as a directive to the funded agency to spend all of the appropriation but, rather, as a legislative authorization to use so much of the specified sum as necessary to achieve the purpose of the appropriation.

While the power of appropriation is constitutionally vested in the General Assembly, the Governor is constitutionally empowered to faithfully execute the laws of the state. Colo. Const. art. IV, § 2. Indeed, this court has recognized that the Governor has the inherent authority to administer funds appropriated by the legislature as an incident to his constitutional responsibility as the chief executive officer of the state. *Anderson v. Lamm,* 195 Colo. 437, 442, 579 P.2d 620, 623–24 (1978). The General Assembly's exercise of the appropriation power is complete once the appropriation has been made and, there-

fore, does not carry with it the authority "to interfere with the executive's power to administer appropriated funds...." *Id.*

It is in light of the respective constitutional functions delegated to both the executive and legislative departments of government, including the inherent or implied powers necessary to carry out those functions, that particular standards must be developed to permit a principled resolution of whether the Governor's budgetary transfers in this case violated the separation of powers doctrine by usurping the legislative power of appropriation.

### B.

I believe the resolution of the separation of powers issue raised in this case requires a court to make in sequential order three separate inquiries. The initial inquiry is whether the Colorado Constitution, by either express provision or clear implication, grants the power in question to a department of government other than the one exercising it. If, for example, the only reasonable construction of the constitution is that the transfer power is expressly granted to the General Assembly or is clearly necessary to the proper exercise of those powers expressly delegated to the General Assembly, then the Governor's budgetary transfers must be deemed to violate the separation of powers doctrine. No further inquiry would be necessary under such circumstances.

If, however, the constitution neither expressly nor by clear implication assigns the power of budgetary transfer to the General Assembly, a court should then ask whether such power may reasonably be implied from the constitutional role delegated to the Governor as chief executive officer of the state. In making this determination, it is appropriate to consider not only the significance of the challenged power to the Governor's constitutional mission, but also whether and to what extent the legislative department has historically recognized or acquiesced in the exercise of the challenged power by the Governor. This latter factor may involve a review of applicable statutes,

legislative resolutions, and the past conduct of the General Assembly, all as indicative of its respective interpretation of the constitutional allocation of power in the matter of budgetary transfers within the executive branch of government. Although the exercise of executive power may not be legitimized by the mere acquiescence of the General Assembly, especially since authoritative interpretation of the state constitution ultimately rests with the judiciary, *e.g., People ex rel. Juhan v. District Court,* 165 Colo. 253, 260, 439 P.2d 741, 745 (1968); *People v. Nothaus,* 147 Colo. 210, 215, 363 P.2d 180, 182 (1961), statutory enactments of the General Assembly may nevertheless inform the judicial interpretation under appropriate circumstances. If, after appropriate inquiry, it is determined that the transfer power is not reasonably necessary to the proper exercise of the Governor's constitutional authority to administer and manage the executive department, then the exercise of that power must be viewed as beyond the scope of the Governor's inherent constitutional authority.

Finally, if the transfer action is found to be reasonably necessary to the proper exercise of the Governor's constitutional power to administer and manage the executive department of government, it must then be determined whether the transfer power prevents or significantly interferes with the exercise of the General Assembly's power of appropriation. This last inquiry should be made in light of the basic purpose of the separation of powers doctrine— that is, to prohibit one department of government from accumulating and exercising power in a manner that prevents another department from accomplishing its constitutionally assigned functions. *E.g., Administrator of General Services,* 433 U.S. at 442–43, 97 S.Ct. at 2789–90. The separation of powers doctrine contemplates that, to the extent constitutionally permissible, each department should be accorded the necessary flexibility to effectively address the complex and ever-increasing range of problems that are placed at the government's doorstep for solution. *E.g.,*

*Bennett,* 219 Kan. at 288–89, 547 P.2d at 791. In making this third and final inquiry, a court should consider the extent to which the challenged action fosters or inhibits the accomplishment of those governmental functions for which the legislature appropriated funds to the executive agencies involved in the transfers. If, for example, both the transferor and transferee agencies have been initially funded by the General Assembly for the purpose of accomplishing their legal responsibilities, and if the transfers would not impair the ability of the transferor agencies to accomplish their legitimate objectives and would also enhance the functional ability of the transferee agencies to achieve their legitimate objectives, and, finally, if the cumulative effect of the transfers would not increase the overall level of appropriations made to the executive department of government, *see* Colo. Const. art. X, § 16, then it would follow that the power of budgetary transfer, far from usurping the legislative power of appropriation, would actually further the ability of the executive department to accomplish those missions for which the legislature has appropriated funds in the first instance.

### C.

Application of the foregoing mode of analysis leads me to conclude that the proper disposition of this case is to reverse that part of the judgment invalidating the budgetary transfers and to remand the case to the trial court for a new trial on this aspect of the controversy. I am led to this conclusion for the following reasons. First, the Colorado Constitution does not expressly grant to the General Assembly the power to make budgetary transfers within the executive department of government. Nor, for that matter, does the constitutional text relating to the General Assembly's power of appropriation, Colo. Const. art. V, § 32, clearly imply that the power of budgetary transfer was intended as a necessary or significant attribute of the power of appropriation. It is necessary, therefore, to determine whether the Governor's transfer power may reasonably be implied as inherent in his constitutionally assigned function of administering and managing the executive department of government.

I conclude as a matter of law that the power to make budgetary transfers within the executive department is, under limited circumstances, an inherent attribute of the Governor's constitutional role as chief executive officer of the state under article IV, section 2 of the Colorado Constitution. As chief executive officer of the state, the Governor has ultimate responsibility for the operation of the executive department of government. *Anderson,* 195 Colo. at 442, 579 P.2d at 623–24. The executive department consists of twenty separate units which were created pursuant to article IV, section 22 of the Colorado Constitution and the Administrative Organization Act of 1968, §§ 24–1–101 to –136, 10 C.R.S. (1982 & 1984 Supp.). *See Colorado State Civil Service Employees Association v. Love,* 167 Colo. 436, 448 P.2d 624 (1968). These governmental units have been delegated a vast array of responsibilities vital to the citizenry of this state. To posit in the office of Governor a limited power to make budgetary transfers is to do no more than recognize what is reasonably necessary to the proper execution of the constitutional role assigned to that office. Moreover, as I discuss in Part IV, *infra,* the General Assembly has itself acquiesced in the Governor's exercise of this power for many years, as evidenced by its incorporation of the transfer statutes, §§ 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982), into the Administrative Organization Act of 1968. This legislative acquiescence, in my opinion, is at least some evidence of the General Assembly's own interpretation of the type of authority that is reasonably necessary to the proper exercise of the Governor's constitutionally assigned functions.

I am thus satisfied that the first two inquiries required by the analysis set forth in Part IIB of this dissent can be answered on the basis of the record on appeal. The third and final inquiry, however, is whether the budgetary transfers in issue prevented

or significantly interfered with the exercise of the General Assembly's power of appropriation. This question, in my view, should not be determined on the basis of the record before us, but rather should be resolved only after the parties to this controversy have been afforded an adequate opportunity to present evidence bearing on the issue. Such evidence should focus on whether and to what extent the transfers impaired the functional ability of the transferor agencies, whether and to what extent the transfers actually enhanced the functional ability of the transferee agencies, whether the transfers permitted the executive department to accomplish those missions for which the legislature appropriated funds in the first instance, and whether the transfers were achieved within the overall level of appropriations made by the General Assembly to the executive department.

### D.

The conclusion reached by the majority—that the executive transfers involved here violated the separation of powers doctrine by directly contravening major legislative budgeting objectives, supra at 522, —proceeds from assumptions which I find unacceptable on several counts. First, the majority assumes that the scope of the Governor's inherent power to administer appropriations made to the twenty departments of the executive branch of government is quite narrow and is subordinate to the General Assembly's power to appropriate. This assumption is obvious from the majority's statement that the Governor's authority to control how executive appropriations are to be allocated is limited "by the principle that the constitution vests the General Assembly with authority to determine 'the *amount* of *state funds*' to be spent for particular purposes." *Supra* at 519 (emphasis in original). The majority's assumption, in my opinion, ignores the fact that the Governor's power to administer and manage the twenty departments of the executive branch of government is part and parcel of his constitutionally assigned role as chief executive officer of the state. Colo. Const. art. IV, § 2; *Anderson,* 195 Colo. at 442, 579 P.2d at 623–24. Subordination of the Governor's authority to manage and administer the executive department of government to the General Assembly's power of appropriation is hardly consistent with the notion of coequal status among the three departments of government. Second, the majority assumes that a budgetary transfer necessarily interferes with the power of appropriation because it distorts the purpose for which the funds were appropriated. While it is true that an appropriation at least implicitly involves a legislative choice of purpose for which the appropriated funds will be used, a budgetary transfer by a coordinate department of government might well be made in a manner that is both consistent with the legislative choice of purpose and the executive power of administration and management. Whether the transfers in question can be so reconciled is a matter that should be determined on the basis of a full evidentiary hearing devoted to that issue. Last, the majority assumes that any transfer between appropriations will necessarily frustrate the legislative purpose established by the original appropriation. This assumption fails to take account of the nature of appropriation as an approximate estimate of the costs of governmental services and, instead, views the sum total of dollars appropriated as the indispensable criterion for achieving the governmental function legally assigned the particular governmental agency. Frustration of legislative purpose is basically a factual question which should not be answered without the benefit of a fully developed factual record. The trial court, not this court, is the proper forum to resolve such a factual matter.

### III.

My final comments are directed to the construction of section 24–30–201(1)(b), 10 C.R.S. (1982), set forth in Part III of the court's opinion. Although the trial court struck down the statute as facially unconstitutional, this court finds the statute constitutional but does so by adopting a construction which I view as inconsistent with

the constitutional principle of inherent power.

While I do not consider the transfer statutes involved here, §§ 24–30–201(1)(b) and 24–37–405(1)(k), 10 C.R.S. (1982), as the ultimate determinant of the scope of the Governor's inherent authority to transfer funds within the executive branch of government, I do believe that when these statutes are read in the context of the Administrative Organization Act of 1968 (hereinafter the 1968 Act), §§ 24–1–101 to –136, 10 C.R.S. (1982 & 1984 Supp.), of which the transfer statutes are a part, a strong case can be made for construing the statutes as providing the procedural framework to allow the Governor to make transfers in accordance with his constitutional responsibility for the administration and management of the executive department of government. The 1968 Act establishes twenty departments of government within the executive department itself, § 24–1–110, 10 C.R.S. (1982 & 1984 Supp.), one of which is the Department of Administration, § 24–1–116, 10 C.R.S. (1982 & 1984 Supp.). The statutory duties of the executive director of the Department of Administration include eliminating unnecessary governmental functions, increasing the efficiency of governmental services, and improving services to the public. § 24–30–102(1), 10 C.R.S. (1982). The 1968 Act made the Division of Accounts and Controls a division within the Department of Administration, with the controller as head of the division. § 24–30–201(1), 10 C.R.S. (1982). The powers and duties of the controller are set forth in one of the transfer statutes involved here, namely section 24–30–201(1)(b), 10 C.R.S. (1982), which provides as follows:

The powers and duties of the division [of accounts and controls] and of the controller shall be:

\* \* \* \* \* \*

(b) To recommend transfers between appropriations under the provisions of law, to be effective upon approval by the [G]overnor.

The 1968 Act also established the Office of State Planning and Budgeting. § 24–1–128.1, 10 C.R.S. (1982).[1] The executive director of this office was delegated the responsibility of developing "the annual executive planning, programming, and budgeting cycle, consistent with the provisions of this article." § 24–37–102(1)(a), 10 C.R.S. (1982). The Division of Budgeting was made a part of the Office of State Planning and Budgeting in order to integrate the policy level planning, programming, and budgeting functions of the executive department into a cohesive and unified system responsive to the policy-making requirements of the Governor and the General Assembly. § 24–37–402, 10 C.R.S. (1982). The 1968 Act requires the Division of Budgeting to assist the Governor "in his responsibilities pertaining to the executive budget" and specifically, as pertinent here, to "[r]eview for the [G]overnor all transfers between appropriations and all work programs recommended by the controller." § 24–37–405(1)(k), 10 C.R.S. (1982). In recognition of the Governor's constitutionally assigned function relating to the administration and management of the executive department of government, the 1968 Act expressly states that "[t]he final authority and decision in all matters relating to the executive budget is hereby vested in the [G]overnor." § 24–37–406, 10 C.R.S. (1982).

The legislative purpose in enacting the 1968 Act was to create a structure of state government which would "be responsive to the needs of the people of the state and sufficiently flexible to meet changing conditions[,] to strengthen the powers of the [G]overnor and [to] provide a reasonable span of administrative and budgetary controls within an orderly organizational struc-

---

1. In 1983, the Office of State Planning and Budgeting ceased to be a separate department and was transferred to the Governor's office. Ch. 273, sec. 16, §§ 24–37–101 to –304, 1983 Colo.Sess.Laws 964. This transfer offset the creation of the Department of Public Safety, thus keeping the total number of departments at no more than twenty, as required by article IV, section 22 of the Colorado Constitution.

ture of state government...." § 24–1–101, 10 C.R.S. (1982). The General Assembly expressly declared in section 24–1–101, 10 C.R.S. (1982), that the 1968 Act "shall be liberally construed to accomplish these purposes." Construing the transfer statute in a manner designed to effectuate the purposes of the 1968 Act leads me to conclude that the "under the provisions of law" language in section 24–30–201(1)(b) means in a manner consistent with the Governor's constitutionally assigned functions of administering and managing the twenty departments of the executive branch of government and in accordance with the procedural protocol for transfers set forth in the 1968 Act.[2] In contrast to the majority, therefore, I would not read into section 24–30–201(1)(b) a requirement that there be some independent legislative authorization given to the Governor to effectuate interdepartmental transfers within the executive branch of government.

Although, as the majority notes, a 1941 statute authorized the Governor to make interdepartmental budgetary transfers from a department with a surplus to a department with a deficit, ch. 2, sec. 11, 1941 Colo.Sess.Laws 35, 52, and this statute was repealed in 1963, ch. 32, sec. 3, Colo.Sess.Laws 120, 122, the most plausible explanation of the repeal is that the 1941 statute was unnecessary because the Governor already had such transfer power under the provisions of the former version of section 24–30–201(1)(b), which was also originally enacted as part of the Administrative Code of 1941, ch. 2, sec. 12, 1941 Colo.Sess.Laws 35, 54. This latter interpretation is confirmed by legislative efforts in 1979 to amend section 24–30–201(1)(b) in a manner that would limit the controller's authority to recommend transfers to line-item appropriations within a department, which transfers would then become effec-

tive only upon written approval by the Governor after written notification to the legislative audit committee and the joint budget committee. Senate Bill 412 (1979). The bill, which passed both houses, was vetoed by the Governor, and the General Assembly failed to override the veto. This history, while certainly not controlling, nonetheless dispels any doubt about the General Assembly's view of the Governor's transfer authority under the present version of section 24–30–201(1)(b).

The construction adopted by the majority virtually equates the legislative power of appropriation with the executive power of transfer. In effect, the majority recognizes the power to transfer but only when authorized pursuant to independent legislative authorization. If, as the majority holds, section 24–30–201(1)(b) authorizes executive transfers only when there is independent legislative authorization for such transfers, the executive department of government is virtually shorn of any inherent transfer authority incident to the Governor's constitutionally assigned function of administering and managing the executive department. Under the majority's construction, the power of transfer becomes a particularized form of legislative appropriation. Within this conceptual framework, I fail to see how the General Assembly could constitutionally delegate any transfer authority to the Governor without concomitantly violating the constitutional prohibition against delegating a legislative function to another department of government. Simply stated, I view the holding in this case as a virtual refutation of executive inherent power and as a relegation of the Governor's constitutionally assigned functions of administration and management to a subordinate status that is irreconcilable

2. Alternatively, the phrase "under provisions of law" might be read as modifying the word "recommend" in section 24–30–201(1)(b). This construction would only allow the controller to make recommendations after determining, pursuant to his duties defined in other subsections of section 24–30–201, that such transfers would not impair the performance of the transferor

department and were necessary to the performance of the transferee department's functions. Again, this interpretation fully accommodates the Governor's inherent power to administer and manage the executive department of government and effectuates the legislative purpose of the Administrative Organization Act of 1968.

with the "separate but equal" principle underlying the separation of powers doctrine.

## IV.

In summary, I would reverse that part of the judgment holding the transfers constitutionally impermissible and would remand the case to the district court for a new trial on the issue of whether, under the standards set forth herein, the Governor's budgetary transfers usurped the General Assembly's power of appropriation in violation of the separation of powers doctrine enunciated in article III of the Colorado Constitution.